## IN RE DORRELL R.*
### (AC 20926)

Foti, Mihalakos and Healey, Js.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued January 17—officially released July 24, 2001

*Lawrence A. Dubin,* for the appellant (respondent mother).

*Mary K. Lenehan,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney general, and *Susan T. Pearlman,* assistant attorney general, for the appellee (petitioner).

*Barry A. Charles,* for the minor child.

*Opinion*

MIHALAKOS, J. The respondent mother appeals from the judgment of the trial court terminating her parental rights with regard to her son, D.[1] On appeal, she claims that the court improperly (1) found that the department of children and families (department) had made reasonable reunification efforts at the time that the petitioner, the commissioner of children and families (commissioner), filed the petition to terminate the respondent's parental rights, (2) found that termination of her paren-

---

[1] The court also terminated the parental rights of the respondent father. He has not appealed from the court's judgment. We therefore refer in this opinion to the respondent mother as the respondent.

tal rights was in the best interest of D and (3) used a "sympathy" standard in deciding whether the respondent acted in the best interest of D. We are not persuaded and affirm the judgment of the trial court.

The following facts and procedural history are necessary to our disposition of the respondent's appeal. D was born on October 22, 1988. He has four siblings, Q, born on December 14, 1983, R, born on April 12, 1991, J, born on November 17, 1992, and A, born on January 1, 1995. On January 8, 1993, and again on February 25, 1993, the Yale-New Haven Hospital Lead Clinic (Yale) filed reports of medical neglect on D's behalf. He had been hospitalized for extreme lead poisoning. High levels of lead were found in D's body, he was suffering from high fevers and repeatedly losing consciousness. The respondent refused to comply with medical follow-up, including immunizations for D. On May 27, 1994, Yale filed a third report of medical neglect on D's behalf. He had been hospitalized once again for extreme lead poisoning, and the respondent did not visit D.

The department investigated and found that the respondent was not following through with D's medical treatment. The respondent also admitted to using cocaine. A department caseworker referred the respondent to the Addiction Prevention Treatment Foundation for substance abuse evaluation and treatment. She did not follow through with the evaluation. The department also found that the family's apartment contained lead and informed the respondent that she would have to move. The department of social services, however, was already in the process of trying to find alternative housing for the family.

On January 6, 1995, a New Haven public school supervisor filed a report of educational neglect on D's behalf. He had been enrolled in a special education preschool, but only attended once. On February 17, 1995, Yale filed

another medical neglect report on D's behalf after he was hospitalized for the tenth time for chelation therapy.[2] On that same day, the commissioner filed a neglect petition and a request for an order of temporary custody with respect to D, citing as the reason the respondent's continuing drug abuse. The court granted an order of temporary custody, and D was placed in a foster home.

On February 27, 1995, the respondent entered a plea of nolo contendere to medical neglect of D and signed a list of court-ordered expectations requiring that she (1) keep appointments with the department, (2) notify the department of her whereabouts, (3) visit D consistently, (4) participate in drug and alcohol counseling, (5) sign releases as requested, (6) secure and maintain adequate housing and income, (7) refrain from substance abuse, (8) secure and maintain a lead free apartment and test her other children for lead poisoning, and (9) release information. On March 17, 1995, D was adjudicated neglected and committed to the care of the commissioner.

On January 12, 1996, during a treatment plan conference with the department, the respondent, once again, signed her service agreement containing the previously mentioned nine requirements. During the five years that D has been in foster care, the respondent failed to comply with most of those requirements.

After D was removed from his mother's care, the department referred the respondent for substance abuse treatment programs at the Addiction Prevention Treatment Foundation and the Hospital of St. Raphael. The respondent canceled all of her appointments for evaluations. The department then referred her to the

---

[2] Chelation therapy is utilized in children who have been exposed to lead. During chelation therapy, a chelating agent is introduced into the patient's bloodstream to increase the urinary excretion of lead. The result of successful chelation therapy is a decrease in the total level of lead in the body.

Four C's agency for home family preservation services.[3] Again, the respondent failed to keep her appointments, and Four C's, thereafter, closed her case.

After D was first placed in foster care, the department scheduled weekly visits between him and his mother. The respondent missed more than half of those scheduled visits. The department then moved the scheduled visits to the respondent's home. That resulted in an improvement of the respondent's attendance, but D repeatedly fell ill during the visits. The respondent informed the department that the lead in the apartment may have accounted for D's illness. The department, thereafter, moved the visits to alternate sites in the community.

In September, 1997, the department received a referral regarding the respondent's other four children. The department investigated and found the respondent, her other four children, Q, R, J and A, and Q's infant daughter, living in an apartment without food, heat or electricity. The respondent continued her substance abuse. The department removed the respondent's four remaining children, along with Q's infant child, from the home. At the time of the trial in this case, none of the respondent's children had been returned to her, and petitions for the termination of her parental rights with regard to R and J were pending.

After the remaining children were removed, the department set up supervised visits for the respondent and D at the department offices. She attended fewer than half of those visits. The department moved the scheduled visits from its offices to various locations in

---

[3] "Four C's" (Coordinating Counseling for Children in Crisis) is a community agency funded by the department that provides services to families in crisis. One of the Four C's primary services is providing parent aides to go into the homes of families in crisis, and provide counseling and assistance to parents.

the community. Still, the respondent attended only spo-
radically.

Following her children's removal, the respondent
once again admitted ongoing substance abuse to her
caseworker. Thereafter, the department made the fol-
lowing referrals: (1) to the Addiction Prevention Treat-
ment Foundation[4] once again, (2) to the Guenster
Rehabilitation Center,[5] (3) to the Hospital of St.
Raphael[6] again, (4) to Amethyst House for inpatient
treatment,[7] (5) to Advanced Behavioral Health Volun-
tary Substance Abuse Services for Primary Caregivers,
(6) to the Women and Children's Center for inpatient
drug treatment on two occasions, (7) to the New Haven
Family Alliance, (8) to Crossroads for inpatient sub-
stance abuse treatment, (9) to the AIDS Interfaith Pro-
gram for individual therapy and substance abuse
services, and (10) to Connecticut Valley Hospital for
outpatient substance abuse. As late as November, 1999,
the respondent sought a substance abuse referral from
her caseworker, but did not follow through.

While in the custody of the department, D was diag-
nosed as autistic, and experienced continued intellec-
tual and cognitive difficulties due to the lead poisoning
that he had suffered as a young child. When D was first
committed to the department's care in February, 1995,
he was six and one-half years old and spoke very few
words. He had not been attending school, suffered from

---

[4] The respondent completed two evaluations with the Addiction Preven-
tion Treatment Foundation, but did not follow-up with her treatment recom-
mendations.

[5] The respondent remained at the Guenster Rehabilitation Center for seven
days. She then left against the staff's advice and without completing her
treatment.

[6] The respondent was referred several times to the Hospital of St. Raphael.
She completed one evaluation, but did not follow through with treatment rec-
ommendations.

[7] The respondent left after one week of inpatient treatment without com-
pleting the program.

high fevers and repeatedly lost consciousness due to severe lead poisoning. After one month of placement, the department moved D to the home of his maternal uncle. In October, 1995, however, D's uncle returned to school and could no longer care for D. At that time, D was placed in the foster home of H.

While with H, D began speaking, reading and bonding with his foster father. H expressed a desire to adopt D, and the department approved that as part of D's long-term treatment plan. The respondent also approved of H's intention to adopt D. In February, 1998, the respondent agreed with the department not to seek reunification with D and consented to the termination of her parental rights so that H might adopt him. On February 17, 1998, the Superior Court found that no further reunification efforts were required for the respondent and D. In September, 1998, H moved to Florida and informed the department that he would be ready to take D after three months. H never returned to take D. D was immensely hurt and disappointed, and the department eventually terminated all communication between D and H. The department coordinated counseling for D to help him deal with H's abandonment and D's placement in a new foster home. D has adjusted well in his current foster home. He calls his foster mother "mom" and has connected with the other children in the home, community and church. He also is doing well in school. That placement is not preadoptive.

D and the respondent were evaluated by a court-appointed psychologist. The psychologist concluded that (1) D requires placement in a home in which the family understands his handicaps and in which he feels acceptance and support, (2) the respondent has significant cognitive limitations and exhibits antisocial traits, both of which would impair her ability to care adequately for D, and hinder her willingness to work with the educational system and D's other service providers,

(3) D is not emotionally bonded to the respondent and neither seeks physical affection from her nor shares memories with her of their life together,[8] and (4) it is not in D's best interest to be returned to the respondent.

On February 1, 1999, the commissioner filed a petition for the termination of the respondent's parental rights as to D. The court had found on February 17, 1998, that further efforts toward reunification of D and the respondent were not appropriate. On May 2, 2000, the court terminated the respondent's parental rights after having determined that she had failed to achieve a sufficient degree of personal rehabilitation. At the present time, D is thirteen years old and must consent before there can be any adoption. D's attorney agrees with the respondent that termination of her rights will not benefit D, and that it would be detrimental to sever his relationships with the respondent and with his siblings.

I

The respondent first claims that the court improperly concluded that the department made reasonable reunification efforts prior to the commissioner's filing of the petition for termination of her parental rights. We disagree.

"It is axiomatic that in seeking to terminate parental rights, the commissioner must prove by clear and convincing evidence that the department made reasonable efforts to reunify the parent and child as required by [General Statutes (Rev. to 1999)] § 17a-112[9] (c) (1). . . .

---

[8] The respondent's caseworker noticed that same lack of an emotional bond between D and the respondent.

[9] General Statutes (Rev. to 1999) § 17a-112 provides in relevant part: "(a) In respect to any child in the custody of the Commissioner of Children and Families in accordance with section 46b-129 . . . the commissioner . . . may petition the court for the termination of parental rights with reference to such child. . . .

\* \* \*

"(c) The Superior Court, upon hearing and notice as provided in sections 45a-716 and 45a-717, may grant a petition filed pursuant to this section if it finds by clear and convincing evidence (1) that the Department of Children

We also note that [t]he statutory criteria must be strictly complied with before termination can be accomplished. . . . On appeal, our function is to determine whether

and Families has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts provided such finding is not required if the court has determined at a hearing pursuant to subsection (b) of section 17a-110 or section 17a-111b that such efforts are not appropriate, (2) that termination is in the best interest of the child, and (3) that: (A) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child; (B) the parent of a child who (1) has been found by the Superior Court to have been neglected or uncared for in a prior proceeding, or (2) is found to be neglected or uncared for and has been in the custody of the commissioner for at least fifteen months and such parent has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child; (C) the child has been denied, by reason of an act or acts of parental commission or omission . . . the care, guidance or control necessary for his physical, educational, moral or emotional well-being. . . . (D) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child . . . .

"(d) Except in the case where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future,

the trial court's conclusion was legally correct and factually supported; every reasonable presumption is made in favor of the trial court's ruling and we will disturb the findings of the trial court in either the adjudication or disposition phases only if they are clearly erroneous." (Citations omitted; internal quotation marks omitted.) *In re Amanda A.*, 58 Conn. App. 451, 454–55, 755 A.2d 243 (2000).

including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child . . . ."

General Statutes § 46b-129 provides in relevant part: "(a) [T]he Commissioner of Social Services, the Commissioner of Children and Families or any child-caring institution or agency approved by the Commissioner of Children and Families . . . may file with the Superior Court which has venue over such matter a verified petition plainly stating such facts as bring the child or youth within the jurisdiction of the court as neglected, uncared-for, or dependent . . . .

"(b) "If it appears from the specific allegations of the petition and other verified affirmations of fact accompanying the petition and application, or subsequent thereto, that there is reasonable cause to believe that (1) the child is suffering from serious physical illness or serious physical injury or is in immediate physical danger from his surroundings and (2) that as a result of said conditions, the child's safety is endangered and immediate removal from such surroundings is necessary to ensure the child's safety, the court shall . . . (B) issue an order ex parte vesting in some suitable agency or person the child's or youth's temporary care and custody. . . ."

General Statutes § 45a-715 (b) provides in relevant part: "A petition for termination of parental rights shall be entitled 'In the interest of . . . (Name of child), a person under the age of eighteen years', and shall set forth with specificity: (1) The name, sex, date and place of birth, and present address of the child; (2) the name and address of the petitioner, and the nature of the relationship between the petitioner and the child; (3) the names, dates of birth and addresses of the parents of the child, if known, including the name of any putative father named by the mother . . . (5) the names and addresses of: (A) The guardian of the person of the child; (B) any guardians ad litem appointed in a prior proceeding . . . and (D) the child-placing agency which placed the child in his current placement; (6) the facts upon which termination is sought, the legal grounds authorizing termination, the effects of a termination decree and the basis for the jurisdiction of the court; (7) the name of the persons or agencies which have agreed to accept custody or guardianship of the child's person upon disposition."

"Before a termination of parental rights can be granted, the trial court must be convinced that the department has made reasonable efforts to reunite the [child with the] family. The term reasonable efforts was recently addressed by this court: Turning to the statutory scheme encompassing the termination of the parental rights of a child committed to the department, the statute imposes on the department the duty, inter alia, to make reasonable efforts to reunite the child or children with the parents. The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible." (Internal quotation marks omitted.) Id., 455.

The court granted the termination petition on the ground that the respondent had failed to achieve a sufficient degree of personal rehabilitation. The court's factual findings are supported by the record and easily meet the requirements set forth by § 17a-112. The court specifically found that (1) appropriate and timely services were provided by the department to the respondent and her family, (2) the department made reasonable efforts to reunify the family, (3) reasonable court expectations were set for the respondent, and she was not able to fulfill them even minimally, (4) D is not emotionally attached to the respondent, (5) D was born on October 22, 1988, (6) the respondent made no changes in her life to accommodate the care and nurturing of D, the respondent visited D sporadically, and only after the filing of the termination petition did she send him gifts and cards and recognize his birthday, and (7) the department took many steps for many years,

encouraging the respondent to both nurture a meaningful relationship with D and to rehabilitate herself.

The respondent specifically claims that because she agreed to H's adoption of D, no efforts were made toward reunification after the February 17, 1998 finding by the Superior Court that further reunification efforts were not required. That does not negate the continuous efforts made by the department prior to February 17, 1998. D was committed to the custody of the commissioner on March 17, 1995. By the time that the court found that no more efforts were necessary, D had been in foster care for three years. The department made constant and continuous efforts during those three years to reunite D and the respondent. As previously discussed, the court found that the respondent did not avail herself of those many opportunities. Further, as late as November, 1999, the respondent requested a referral for drug treatment from the department, which the department provided. She once again failed to follow through. "Reasonable efforts" does not mean "every possible" effort, but every reasonable effort. The evidence clearly shows that the department made every reasonable effort to reunite the respondent with D.

We conclude that the court properly found, by clear and convincing evidence, that the department made reasonable reunification efforts.

II

The respondent next claims that the court improperly found that termination of her parental rights is in the best interest of D. We disagree.

"The desire and right of a parent to maintain a familial relationship with a child cannot be separated from the desire and best interest of a child either to maintain or to abandon that relationship, or the interest of the state in safeguarding the welfare of children. These legitimate

interests of parent, child and state require a balancing of the factors involved in those interests. . . . In every case involving parental rights, a struggle exists between parents and the state to determine what is in the child's best interest, the child being the focus of the struggle." (Citation omitted.) *In re Shaquanna M.*, 61 Conn. App. 592, 598–99, 767 A.2d 155 (2001).

"In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven factors delineated in [General Statutes (Rev. to 1999)] § 17a-112 (d). On appeal, we will disturb the findings of the trial court in both the adjudication and disposition only if they are clearly erroneous." (Internal quotation marks omitted.) *In re Tyscheicka H.*, 61 Conn. App. 19, 26, 762 A.2d 916 (2000).

As previously stated, the court made detailed, written findings regarding all seven factors required by § 17a-112 (d). In its memorandum of decision, filed May 2, 2000, the court further stated that "there is no biological parent ready now or in the foreseeable future who will be able to care for [D]. Despite the fact that continued counseling between [the respondent] and [D] could possibly improve their relationship, the court concludes it is both too little and too late as [the respondent] simply does not possess the capacity to care for this special needs child. The court concludes, from the clear and convincing testimony, that it is in [D's] best interest to have permanency and stability in his life. The court further finds that adoption by a family that understands and can accommodate his special needs is the avenue most likely to accomplish this result for [D]. The court also finds the testimony concerning [D's] adoptability

persuasive. The court is aware that there are a number of private adoption agencies for placement [of] children like [D]. The court concludes that termination of [the respondent's] rights to him will make his ultimate adoption more probable."

We see no reason to disturb the findings of the court, and conclude that those findings are well supported by the record and illustrate (1) the department's continued efforts to reunite the respondent and D, (2) the respondent's failure to comply with any of those efforts, (3) that D's best interest lies in his chances for adoption and (4) that termination of the respondent's parental rights will make D's adoption more likely. D has now been in foster care for more than six years. There is no evidence before us that during those six years, the respondent made any progress toward rehabilitating herself. D's best interest lies in the hope that he will be adopted by a family that understands and can accommodate his special needs, not that he will be returned to the respondent.

## III

The respondent's final claim is that the court improperly utilized a "sympathy standard" in determining the best interests of D. We disagree.

The respondent's claim stems from a passage in the court's memorandum of decision, which states: "The court would have some slight sympathy with this argument[10] had [the department] cut off [the respondent's] access to D after February, 1998, and not provided either visitation or services. The claim would have even more merit had [the respondent] made demonstrable progress in the early years of [D's] placement. But neither of these things happened. [The respondent] had

---

[10] The court refers to the respondent's argument, repeated on appeal, that the department failed to make reasonable efforts toward reunifying her with D after February, 1998.

not made any progress toward reunification when [D] had been in [foster] care for over two years. Further, [the department] has permitted visitation up to the present time. [The department] has also continued to provide services after the termination petition was filed, despite the court order."

The respondent fails to provide either legal authority or analysis to support her theory. "We are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *In re Shane P.*, 58 Conn. App. 234, 243–44, 753 A.2d 409 (2000). "We will not review claims absent law and analysis." *Altfeter* v. *Naugatuck*, 53 Conn. App. 791, 796 n.5, 732 A.2d 207 (1999).

As previously stated, the court made detailed and voluminous findings regarding the respondent's failure to achieve a sufficient degree of rehabilitation and D's best interest. Simply because the court couched a small portion of its discussion in terms of sympathy, or lack thereof, does not undermine in any way the ample evidentiary support for its determination regarding the best interest of D. The court applied the correct standard according to § 17a-112 (d).

The judgment is affirmed.

In this opinion the other judges concurred.