# IN RE JEISEAN M.*
## (SC 17012)

Sullivan, C. J., and Norcott, Katz, Palmer and Zarella, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Reporter of Judicial Decisions

Argued January 13—officially released July 27, 2004

*William S. Bingham*, for the appellant (respondent mother).

*Michael J. Besso*, assistant attorney general, with whom were *Eliot D. Prescott*, assistant attorney general, and, on the brief, *Richard Blumenthal*, attorney general, and *Susan T. Pearlman*, assistant attorney general, for the appellee (petitioner).

*Elisabeth Borrino*, for the minor child.

*Shelley A. White*, *Claudine Siegel* and *Royal Stark* filed a brief for the Connecticut Legal Services, Inc., et al. as amici curiae.

*Opinion*

SULLIVAN, C. J. The respondent mother[1] appeals from the trial court's judgment terminating her parental rights with respect to her son, Jeisean M.[2] She contends that in light of this court's decision in *Roth* v. *Weston*, 259 Conn. 202, 789 A.2d 431 (2002), General Statutes § 17a-112 (j)[3] is facially unconstitutional or unconstitu-

[1] A judgment of default was rendered against the respondent father, and he has not appealed. We refer in this opinion to the respondent mother as the respondent.

[2] We granted the minor child's motion to transfer the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

[3] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court, upon hearing and notice as provided in sections 45a-716 and 45a-717, may grant a petition filed pursuant to this section if it finds by clear and convincing evidence (1) that the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts provided such finding is not required if the court has determined at a hearing pursuant to subsection (b) of section 17a-110 or section 17a-111b that such efforts are not appropriate, (2) that termination is in the best interest of the child, and (3) that: (A) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child; (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected

tional as applied to the facts of the present case under the due process clause of the fourteenth amendment to the United States constitution and article first, § 8, of the constitution of Connecticut. She also contends that the trial court improperly found, in its February 15, 2002 memorandum of decision, clear and convincing evidence sufficient to conclude that she had failed to achieve sufficient personal rehabilitation and that terminating her parental rights was in the child's best interest. In addition, she claims that: (1) the trial court violated her due process rights by finding, on May 17, 2001, that efforts to reunify the respondent and Jeisean were no longer appropriate; (2) the trial court, in its February 15, 2002 memorandum of decision, improperly took judicial notice of the May 17, 2001 finding; (3) the trial court's May 17, 2001 order to extend Jeisean's commitment amounted to an unconstitutional summary proceeding because there was insufficient evidence to conclude that the respondent had notice of the proceeding and because she did not know that she was not represented by counsel and she was not informed of

or uncared for in a prior proceeding, or (ii) is found to be neglected or uncared for and has been in the custody of the commissioner for at least fifteen months and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child; (C) the child has been denied, by reason of an act or acts of parental commission or omission including, but not limited to, sexual molestation or exploitation, severe physical abuse or a pattern of abuse, the care, guidance or control necessary for the child's physical, educational, moral or emotional well-being. Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights; [or] (D) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child . . . ."

the proceeding's gravity; and (4) the trial court, at the May 17, 2001 hearing, failed to assess Jeisean's best interest, as required by General Statutes § 46b-129 (k) (2). Finally, the respondent contends that General Statutes (Rev. to 2001) §§ 17a-111b and 46b-129 (k) (2), regarding the propriety of efforts to reunify the parent and child, are facially unconstitutional or unconstitutional as applied to the facts of the case because the statutes, at the time of the May 17, 2001 hearing, did not include a requirement that the court find, by clear and convincing evidence, that efforts to reunify her with Jeisean were no longer appropriate.[4] We reject these claims and affirm the trial court's judgment.

The record reveals the following procedural history and facts. On July 24, 2001, the commissioner of children and families (commissioner) filed a petition to

---

[4] General Statutes (Rev. to 2001) § 46b-129 (k) provides in relevant part: "(2) At such [a permanency] hearing, the court shall determine whether it is appropriate to continue to make reasonable efforts to reunify the child or youth with the parent. In making this determination, the court shall consider the best interests of the child, including the child's need for permanency. If the court finds that further efforts are not appropriate, the commissioner has no duty to make further efforts to reunify the child or youth with the parent. If the court finds that further efforts are appropriate, such efforts shall ensure that the child or youth's health and safety are protected and such efforts shall be specified by the court, including the services to be provided to the parent, what steps the parent may take to address the problem that prevents the child or youth from safely reuniting with the parent and a time period, not longer than six months, for such steps to be accomplished."

General Statutes (Rev. to 2001) § 17a-111b provides in relevant part: "(a) The Commissioner of Children and Families may, at any time, petition the court for a determination on whether reasonable efforts to reunify the parent with the child are appropriate. The court may determine that such efforts are not appropriate if: (1) The parent has subjected the child to the following aggravated circumstances: (A) The child has been abandoned as defined in subsection (j) of section 17a-112 . . . ."

Those statutes were subsequently amended; see Public Acts 2001, No. 01-142, §§ 3 and 7; to require that if the court makes the determination that reunification efforts are not appropriate, that determination must be supported by clear and convincing evidence.

terminate the respondent's parental rights. The following evidence was presented at trial on November 26 and December 13, 2001. Jeisean, who was born December 3, 1999, is the respondent's only child. Following Jeisean's birth, the respondent lived with her sister in New Britain and relied on both her sister and her aunt to assist her in caring for Jeisean. On the evening of March 14, 2000, the respondent left Jeisean in her aunt's care. The respondent did not return that evening, however, and also failed to return the following morning. On the morning of March 15, Jeisean became congested and experienced difficulty breathing. The aunt telephoned the department of children and families (department) to obtain help for Jeisean because she was unable to bring him to the hospital and was unsure of the respondent's whereabouts. The department sent Wanda Milledge, a department investigator, to the aunt's home, and the child was treated at a hospital. Later that day, the respondent informed Milledge that "her head wasn't straight" because she had recently ingested illicit drugs. More specifically, the respondent stated that she had not returned to her aunt's house on the evening of March 14 or the morning of March 15 because she had "pass[ed] out" after ingesting Ecstasy. On March 15, the commissioner exercised a ninety-six hour administrative hold over Jeisean. See General Statutes § 17a-101g. On March 17, the court granted an order of temporary custody and placed Jeisean in emergency foster care. See General Statutes § 46b-129 (b). On March 24, 2000, the trial court, pursuant to § 46b-129 (e), sustained the order of temporary custody when the respondent failed to appear at the hearing. On April 14, Jeisean was placed in a licensed foster care home, where he has remained throughout the pendency of this action.

On April 16, 2000, the department provided the respondent with an intern to assist and encourage her in meeting with service providers. The respondent

failed to take advantage of this assistance and missed several appointments, which she later failed to reschedule.

The respondent also was assigned a social worker, Elisa Warga, who, on the respondent's behalf, made several referrals to treatment and counseling organizations, including Catholic Family Services, the Institute for Hispanic Families, and the Alcohol and Drug Recovery Center. Although Warga advised the respondent repeatedly that her cooperation during treatment and counseling was necessary for her to be reunited with Jeisean, the respondent did not cooperate with these programs.

Catholic Family Services attempted to assist the respondent from May, 2000, through September, 2000, but it reported that the respondent had put minimal effort into her treatment and recovery and had missed four sessions out of ten. The report also indicated that on three occasions—June 2, June 9 and August 28, 2000—she had tested positive for marijuana. When Warga confronted her with these reports, the respondent became angry, cursed at Warga, accused her of lying, and indicated that she would no longer listen to her.

On June 11, 2000, Warga referred the respondent to the Alcohol and Drug Recovery Center. On that date, the respondent submitted a urine sample that tested positive for marijuana. She never attended the program because she stated that it was located too far away from her residence in Springfield, Massachusetts.

On June 20, 2000, the trial court concluded that Jeisean was uncared for and required specialized care and ordered him committed to the custody of the commissioner through June 20, 2001. See General Statutes § 46b-129 (j). In response to the allegations, the respondent entered a plea of nolo contendere pursuant to

§ 46b-129 (d) (5). In addition, the court ordered specific steps to facilitate the respondent's reunification with Jeisean. The court ordered the respondent to keep all appointments set by the department, to participate in parenting and individual counseling toward certified treatment goals, to submit to substance abuse assessment and to follow recommendations for treatment, to submit to random drug testing, to secure and maintain adequate housing and income, to visit the child as permitted and to discontinue her substance abuse.

On October 11, 2000, Warga referred the respondent to the Institute for Hispanic Families (institute). The respondent was uncooperative at the institute as well. She was discharged for noncompliance after she tested positive for marijuana and phencyclidine, and failed to attend several counseling sessions despite efforts by the institute and Warga to help her to attend the sessions. The institute's discharge summary indicated that the respondent's status and symptoms had not changed, and the institute concluded that she still needed treatment.

The respondent completed a parenting class at the family preservation program at Child and Family Services of Pioneer Valley in Springfield. Donna Heap, a coordinator of the family preservation program, testified during the trial on the commissioner's petition to terminate the respondent's parental rights that the respondent was an active participant in the class and that she had attended nine out of ten sessions during the fall of 2001. She earned a certificate of completion in the class, which focused on parenting and other skills relevant to caring for a child under the age of twelve.

The respondent also initiated a substance abuse treatment program at the Gandara Mental Health Center (Gandara) in Springfield. The respondent's progress at this program, however, was inconclusive. A Gandara

report indicated that the respondent missed a session on December 3, 2001. Although she tested negative for illegal substances on December 7, the respondent represented inconsistently the extent of her drug use. For example, the respondent claimed to have been sober for two years, but that claim was clearly inconsistent with the evidence introduced regarding her substance abuse record at other treatment facilities. The Gandara report also indicated that the respondent may have been depressed and included the respondent's admissions that she had experienced auditory and visual hallucinations.

The department ordered the respondent to keep it informed of her location, but she failed to comply. Although she had informed Warga that she was residing with her father in New Britain, the respondent did not notify Warga when she moved to a friend's home in Hartford. She subsequently informed Warga that she had returned to live with her father, but unannounced visits revealed that she was not in fact residing there. At the time of trial, the respondent was living with another woman in Springfield, but she had not demonstrated an ability to maintain her own apartment or to live independently.

The respondent also failed to secure and maintain adequate income, as ordered by the trial court on June 20, 2000. Prior to the court's order, the respondent had been employed at a McDonald's restaurant around March and April, 2000, but left that position because her supervisor allegedly harassed her. The respondent claimed to have worked at Filene's but never substantiated that claim. Following the commissioner's July 24, 2001 filing of the petition to terminate parental rights, however, the respondent secured part-time employment at the Springfield College cafeteria.

The department scheduled weekly visits between the respondent and Jeisean. Although the respondent vis-

ited Jeisean regularly during the year 2000, she visited Jeisean sporadically during the year 2001. She missed scheduled visitation appointments on March 1, March 8, March 20, April 10, August 9 and August 23, 2001. In addition, she did not contact the department worker to explain her absence on those dates. The respondent testified that she had been involved in a car accident in March, 2001, and had been undergoing therapy in Springfield. Although she testified that she had encountered difficulty securing transportation to visit Jeisean, she failed to establish how that prevented her from calling to explain her absences. When she did visit, however, she showed Jeisean affection and interacted well with him.

On May 17, 2001, in response to the commissioner's motion for review of the permanency plan and to maintain Jeisean's commitment, the trial court concluded that extending Jeisean's commitment from June 20, 2001, through June 20, 2002, was in Jeisean's best interests. In addition, the trial court concluded that reasonable efforts to reunify the respondent with Jeisean were no longer appropriate. The trial court also approved the permanency plan, which called for terminating the respondent's parental rights with respect to Jeisean and seeking an adoptive parent for him.

In its July 24, 2001 petition for termination of parental rights, the commissioner alleged that the trial court had determined at the May 17, 2001 hearing that reasonable efforts to reunify the respondent and Jeisean were no longer appropriate. See General Statutes § 17a-112 (j).[5] In addition, the commissioner alleged that the respondent had "failed to achieve such degree of personal rehabilitation as would encourage the belief that within

[5] For the text of General Statutes § 17a-112 (j), see footnote 3 of this opinion.

a reasonable time, considering [Jeisean's age and needs, she] could assume a responsible position in [his] life . . . ."

On November 26, 2001, during the trial on the commissioner's petition to terminate the respondent's parental rights, the commissioner requested that the trial court take judicial notice of the trial court's May 17, 2001 finding that continued efforts to reunify the respondent with Jeisean were no longer appropriate. Over the respondent's objections, the trial court granted the commissioner's request.

On February 15, 2002, the trial court granted the commissioner's petition to terminate the respondent's parental rights with respect to Jeisean. The trial court determined, pursuant to § 17a-112 (j) (3) (B), that the commissioner had shown by clear and convincing evidence that the respondent had failed to achieve "such degree of personal rehabilitation as would encourage the belief that . . . [the respondent] could assume a responsible position in [Jeisean's] life . . . ." The court also determined that termination of the respondent's parental rights was in Jeisean's best interest. The respondent appealed from the trial court's judgment terminating her parental rights.[6]

I

The respondent first claims that, in light of the United States Supreme Court's decision in *Troxel* v. *Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000), and our decision in *Roth* v. *Weston*, supra, 259 Conn.

[6] The commissioner filed a cross appeal in the Appellate Court challenging the trial court's grant of the respondent's application for waiver of fees, costs and expenses to appeal. The Appellate Court, suo motu, dismissed the cross appeal, and the commissioner, upon granting of certification, appealed to this court. We addressed the commissioner's cross appeal in the companion case of *In re Jeisean M.*, 270 Conn. 406, 852 A.2d 657 (2004), which we released on the same date as this opinion.

202, § 17a-112 (j) is facially unconstitutional or unconstitutional as applied to the facts of this case under the due process clause of the fourteenth amendment to the United States constitution[7] and article first, § 8, of the constitution of Connecticut.[8] We disagree.

"In *Troxel*, the plaintiffs, the paternal grandparents, sought visitation with their two granddaughters in excess of [the one short visit per month that] the defendant, the children's mother, had allowed. *Troxel* v. *Granville*, supra, 530 U.S. 60–61. The defendant and the plaintiffs' son, the father of the children, had never married. Id., 60. After the plaintiffs' son and the defendant ended their relationship, the plaintiffs' son committed suicide. Id. The defendant married another man, who formally adopted the children. Id., 61–62." *In re Joshua S.*, 260 Conn. 182, 203, 796 A.2d 1141 (2002).

In *Troxel*, the Washington Superior Court ordered that the grandparents be permitted visitation with their granddaughters for one weekend per month, one week during the summer, and four hours on both of the petitioning grandparents' birthdays. *Troxel* v. *Granville*, supra, 530 U.S. 61. On appeal, the Washington Appellate Court reversed the trial court's visitation order and dismissed the grandparents' petition for visitation. Id., 62. The Washington Supreme Court affirmed the Appellate Court's judgment that the grandparents could not obtain visitation of their grandchildren pursuant to a statute that "allowed any person to petition for visitation rights at any time and authorized the Washington state Superior Courts to grant such rights whenever visitation may serve in the child's best interests. Id., 60.

---

[7] The fourteenth amendment to the United States constitution, § 1, provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

[8] Article first, § 8, of the constitution of Connecticut provides in relevant part: "No person shall . . . be deprived of life, liberty or property without due process of law . . . ."

The United States Supreme Court affirmed the judgment of the Washington Supreme Court, holding that the statute, as applied in that case, violated the due process clause of the fourteenth amendment to the United States constitution, because it was an 'infringement on [the defendant's] fundamental right to make decisions concerning the care, custody, and control of her two daughters.' Id., 66, 72. In support of this determination, the court reasoned that Washington's 'breathtakingly broad' statute permitted a decision concerning visitation made by a fit custodial parent to be overruled on the basis of a Superior Court judge's determination that visitation with a third party would be in the child's best interests. Id., 67." *In re Joshua S.*, supra, 260 Conn. 203–204.

"In light of the United States Supreme Court's decision in *Troxel*, we recently addressed a similar question concerning a nonparent petitioning for visitation in *Roth* v. *Weston*, [supra, 259 Conn. 202], and in *Crockett* v. *Pastore*, 259 Conn. 240, 789 A.2d 453 (2002). Relying on *Troxel*, we held in these cases that the protected fundamental right of a parent to make child rearing decisions mandates that where a third party seeks visitation, that third party must allege and prove, by clear and convincing evidence, a relationship with the child that is similar in nature to a parent-child relationship, and that denial of the visitation would cause real and significant harm to the child. *Roth* v. *Weston*, supra, 234–35; *Crockett* v. *Pastore*, supra, 246." *In re Joshua S.*, supra, 260 Conn. 204.

"In situations such as in *Troxel*, *Roth* and *Crockett*, where a presumably fit parent is alive, the constitutionally protected interest is that of the ongoing parent-child relationship. [A] parent's desire for and right to the companionship, care, custody, and management of his or her children is an important interest that undeniably warrants deference and, absent a powerful coun-

tervailing interest, protection. . . . Choices about marriage, family life, and the upbringing of children are among associational rights this Court has ranked as of basic importance in our society . . . rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." (Citations omitted; internal quotation marks omitted.) Id., 204–205.

We have also stated that "[t]he family entity is the core foundation of modern civilization. The constitutionally protected interest of parents to raise their children without interference undeniably warrants deference and, absent a powerful countervailing interest, protection of the greatest possible magnitude. *Lassiter* v. *Dept. of Social Services*, 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981); *Stanley* v. *Illinois*, [405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)]. Consequently, interference is justified only when it can be demonstrated that there is a compelling need to protect the child from harm. In the absence of a threshold requirement of a finding of real and substantial harm to the child as a result of the denial of visitation, forced intervention by a third party seeking visitation is an unwarranted intrusion into family autonomy." *Roth* v. *Weston*, supra, 259 Conn. 228–29.

"There are . . . limitations on these parental rights. Some of these limitations arise out of an appreciation of the state's long recognized interests as parens patriae. . . . [See] General Statutes § 10-204a (requiring parents to immunize children prior to school enrollment); General Statutes §§ 14-100a, 14-272a (requiring child restraint in vehicles); General Statutes § 17a-81 (authorizing emergency medical treatment where parent withholds consent); General Statutes §§ 31-23, 31-24 (restricting child labor from certain occupations or workplaces); General Statutes § 53-21a (prohibiting parents from leaving child unsupervised in public accom-

modation or vehicle). Furthermore, it is unquestionable that in the face of allegations that parents are unfit, the state may intrude upon a family's integrity. *Parham* v. *J. R.*, [442 U.S. 584, 603, 99 S. Ct. 2493, 61 L. Ed. 2d 101 (1979)]; see General Statutes § 17a-101g (removal of child where imminent risk of harm); General Statutes §§ 17a-112 (j), 45a-717 (termination of parental rights). Therefore, it is clear that a requirement of an allegation such as abuse, neglect or abandonment would provide proper safeguards to prevent families from defending against unwarranted intrusions and would be tailored narrowly to protect the interest at stake." (Citations omitted.) *Roth* v. *Weston*, supra, 259 Conn. 224.

We conclude that our statement in *Roth* that the constitutionally protected interest of parents to raise their children without interference undeniably warrants deference and, absent a powerful countervailing interest, protection of the greatest possible magnitude, does not control our resolution of the constitutional issue in this case. Our conclusion in *Roth* that third party visitation should be ordered contrary to the desires of a fit parent only when it has been proved by clear and convincing evidence that the children would suffer actual, significant harm if deprived of the visitation was rooted in the presumption that the decisions of a *fit* parent are in the best interests of the child. In contrast, the present case involves a statute authorizing the termination of the parental rights of an unfit mother upon proof by clear and convincing evidence that the child has been, among other things, uncared for. In *Roth*, we expressly recognized that "in the face of allegations that parents are *unfit*, the state may intrude upon a family's integrity." (Emphasis added.) Id. The question in that case was "whether something *less than* an allegation and proof in support of abuse, neglect or abandonment [would] suffice to permit an intrusion [upon parental autonomy]." (Emphasis in original.) Id., 225. The

respondent has cited no authority for the proposition that the government must presume that a parent who has been shown, by clear and convincing evidence, to be *unfit* acts in the best interests of the child and is, therefore, entitled to raise the child without interference. We find this proposition to be implausible on its face. The respondent's constitutional challenge to § 17a-112 (j) therefore fails.

## II

The defendant next claims that the trial court improperly found, in its February 15, 2002 decision, that there was clear and convincing evidence to support the commissioner's claim that the respondent had failed to achieve sufficient personal rehabilitation and that termination of parental rights was in Jeisean's best interest, given the absence of any expert testimony or evidence that the respondent had failed to achieve rehabilitation or that Jeisean would be harmed if the court failed to terminate her rights. We disagree.

## A

"On appeal, we review a trial court's finding that a parent has failed to rehabilitate herself in accordance with the rules that apply generally to a trier's finding of fact. We will overturn such a finding of fact only if it is clearly erroneous in light of the evidence in the whole record. . . . [G]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [O]n review by this court every reasonable presumption is made in favor of the trial court's ruling." (Citations omitted; internal quotation marks omitted.) *In re Eden F.*, 250 Conn. 674, 705–706, 741 A.2d 873 (1999).

"[W]e are not in a position to second-guess the opinions of witnesses, professional or otherwise, nor the observations and conclusions of the Juvenile Court when they are based on reliable evidence." *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 668, 420 A.2d 875 (1979). Although we often consider the testimony of mental health experts; see, e.g., id., 667 (in a termination proceeding "[p]sychological testimony from professionals is rightly accorded great weight"); *In re Rebecca W.*, 8 Conn. App. 92, 95–96, 510 A.2d 1017 (1986) (affirming trial court's conclusion made on basis of "testimony of [expert witness] and the petitioner, that the continuation of the [respondent's] parental rights would have a clearly detrimental effect on the future well-being of the child"); "such expert testimony is not a precondition of the court's own factual judgment as to the child's best interest. See, e.g., General Statutes § 45-61f (d), which provides in pertinent part that the court *may* order [a minor] child [who is the subject of a termination proceeding] to be examined at a suitable place by a physician, psychiatrist or licensed clinical psychologist appointed by the court. The court *may* also order examination of a parent or custodian whose competency or ability to care for a child before the court is at issue. . . . The court *may* consider the results of the examinations in ruling on the merits of the petition." (Emphasis in original; internal quotation marks omitted.) *In re Teshea D.*, 9 Conn. App. 490, 493, 519 A.2d 1232 (1987).

"Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . Rehabilitate means to restore [a . . . delinquent person] to a useful and constructive place in society

through social rehabilitation. [Webster's] Third New International Dictionary. The statute does not require [a parent] to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation she has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life." (Citation omitted; internal quotation marks omitted.) *In re Eden F.*, supra, 250 Conn. 706.

We conclude that the record supports the trial court's finding that the commissioner had proved by clear and convincing evidence that the respondent had failed to attain a degree of rehabilitation sufficient to warrant the belief that, at some time in the foreseeable future, she would be capable of assuming a responsible position with respect to her child's care. There was ample evidence of the respondent's documented struggle with drug abuse, inability to secure and maintain adequate employment and income, inability to live independently and inexplicable absences from scheduled visits to see Jeisean. The respondent, however, points to evidence establishing that she had progressed in achieving stability in her life. For example, at the time of the trial court's February 15, 2002 decision, the respondent was working part-time at Springfield College. In addition, in the fall of 2001, she completed a ten session parenting class for which she received a certificate of completion. In light of all the evidence, however, we cannot say that the trial court was clearly erroneous in concluding that the commissioner had met her burden of showing by clear and convincing evidence that the respondent had failed to reach such a degree of rehabilitation as would encourage the belief that, within a reasonable

period of time, she could assume a responsible position in Jeisean's life.

The absence of expert testimony does not affect our conclusion. Although expert testimony may be accorded great weight when it is offered, there is no requirement for expert testimony in termination of parental rights cases. Cf. *In re Angela C.*, 11 Conn. App. 497, 499, 528 A.2d 402 (1987) ("trial court was not required to accept the expert's opinion on the issue of whether to terminate the mother's parental rights, nor was the testimony of another expert required to support the trial court's judgment"); *In re Teshea D.*, supra, 9 Conn. App. 493 (explaining that although we "have often . . . looked to the testimony of mental health experts . . . [s]uch expert testimony is not a precondition of the court's own factual judgment as to the child's best interest" [citations omitted]). The record in this case was sufficient to support the trial court's finding without testimony from an expert.

B

The respondent also claims that the evidence did not support the trial court's finding in its February 15, 2002 memorandum of decision that termination of her parental rights with respect to Jeisean was in the child's best interest. We disagree.

The following additional facts are relevant to this claim. The trial court concluded that, although Jeisean acknowledged the respondent as his mother, he called his foster parents "Mommy" and "Poppy" and also acknowledged one of their foster children as his sibling. In addition, the court noted that Jeisean had been in the same foster home for twenty of his twenty-four months of life and that his foster parents had expressed a willingness to adopt him.

We have noted consistently the importance of permanency in children's lives. *In re Juvenile Appeal (Anony-*

*mous)*, 181 Conn. 638, 646, 436 A.2d 290 (1980) (removing child from foster home or further delaying permanency would be inconsistent with his best interest); *In re Victoria B.*, 79 Conn. App. 245, 263, 829 A.2d 855 (2003) (trial court's findings were not clearly erroneous where much of child's short life had been spent in custody of commissioner of children and families and child needed stability and permanency in her life); *In re Teshea D.*, supra, 9 Conn. App. 493–94 ("child's need for permanency in her life lends added support to the court's finding that her best interest warranted termination of the respondent's parental rights"). "Virtually all experts, from many different professional disciplines, agree that children need and benefit from continuous, stable home environments." (Internal quotation marks omitted.) *In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 285, 455 A.2d 1313 (1983). In light of our decision in part II A that the trial court was not clearly erroneous in concluding that the commissioner had shown, by clear and convincing evidence, that the respondent had failed to reach a degree of rehabilitation sufficient to satisfy the statute, coupled with the need for permanency in Jeisean's life, we conclude that the trial court did not improperly conclude that clear and convincing evidence established that it was in Jeisean's best interest to terminate the respondent's parental rights.

III

The respondent next claims that: (1) the trial court in its February 15, 2002 memorandum of decision improperly took judicial notice of the trial court's May 17, 2001 determination that efforts to reunify the respondent with Jeisean were no longer appropriate; (2) the trial court's May 17, 2001 finding was improper and violated her due process rights; (3) the trial court's May 17, 2001 order to extend Jeisean's commitment amounted to an unconstitutional summary proceeding

because there was insufficient evidence to conclude that the respondent had notice of the proceeding and because she did not know that she was not represented by counsel and she was not informed of the proceeding's gravity; (4) at its May 17, 2001 hearing, the trial court failed to assess Jeisean's best interest, as required by § 46b-129 (k) (2); and (5) the statutory provisions pertaining to efforts to reunify the parent and child are facially unconstitutional or unconstitutional as applied to the facts of the case, amounting to an unconstitutional deprivation of the respondent's rights.

A

The respondent first contends that she did not have notice that the state, at trial on November 26, 2001, would seek to have the trial court take judicial notice of its May 17, 2001 finding. Furthermore, she argues that her attorney was uncertain about whether the trial court's May 17, 2001 finding was lawfully made because he had not been the respondent's counsel at that time. Consequently, the respondent contends, the trial court improperly took judicial notice of the May 17, 2001 finding. We disagree.

"A party requesting the court to take judicial notice of a fact shall give timely notice of the request to all other parties. Before the court determines whether to take the requested judicial notice, any party shall have an opportunity to be heard." Conn. Code Evid. § 2-2. "So long as the parties are offered an opportunity to be heard the court may notice any fact concerning the parties and events of the case that is appropriate for judicial notice." *State* v. *Zayas*, 195 Conn. 611, 615, 490 A.2d 68 (1985). Trial courts may take judicial notice of facts contained in the court file; *Brockett* v. *Jensen*, 154 Conn. 328, 336, 225 A.2d 190 (1966); and may take notice of court files in other actions between the same parties.

*Carpenter* v. *Planning & Zoning Commission,* 176 Conn. 581, 591, 409 A.2d 1029 (1979).

In the present case, the department stated, at the November 26, 2001 trial proceeding, that it had forgotten to request that the trial court take judicial notice of its May 17, 2001 finding that efforts to reunify the respondent and Jeisean were no longer appropriate. See General Statutes § 17a-112 (j) (1). When the trial court gave the respondent an opportunity to be heard, the respondent's attorney objected on the grounds that he had not been the attorney of record at the time of the May 17, 2001 ruling and that he did not know precisely what had happened at that proceeding. The trial court nonetheless took judicial notice of its May 17, 2001 decision because it concluded that the matters addressed in the file involved the same parties and the same standards of proof and evidence.

The respondent has cited no authority for the proposition that a party's unfamiliarity with a matter renders it unsuitable for judicial notice. Accordingly, that argument fails.

The respondent's argument that her attorney could not assess the lawfulness of the prior proceedings is also without merit. The trial court appointed the respondent's current attorney on August 29, 2001. The commissioner did not ask the trial court to take judicial notice of the trial court's May 17, 2001 finding until November 26, 2001, which gave the respondent's attorney almost three months before the termination hearing to familiarize himself with the procedural history of the case. If he had any doubts about the lawfulness of any of these proceedings, the proper time to raise them was before the hearing or, at the latest, at the hearing when the court provided him with an opportunity to be heard. We therefore conclude that the trial court properly took judicial notice of the May 17, 2001 finding.

B

The respondent next claims that the trial court's May 17, 2001 order to extend Jeisean's commitment amounted to an unconstitutional summary proceeding because: (1) there was insufficient evidence to conclude that the respondent had notice of the proceeding; (2) the respondent did not know that she was not represented by counsel; and (3) the respondent was not informed of the seriousness of the proceedings. We disagree.

The following additional facts are relevant to this claim. On April 27, 2001, the trial court granted a motion by the respondent's attorney to withdraw her appearance. The respondent's attorney withdrew because the respondent had not maintained contact with her. The trial court's April 27, 2001 memorandum indicated that the next hearing was scheduled for May 17, 2001, and that the "mother shall receive notice of [the May 17, 2001] extension hearing from the clerk's office." The respondent contends that she did not attend this hearing because she did not have notice of it. Furthermore, she contends that she was unaware that she was not represented by counsel at the proceeding.

At the May 17, 2001 hearing, the trial court continued Jeisean's commitment and ruled on the department's permanency plan for Jeisean. "An extension of commitment is an immediately appealable final judgment." *In re Kachainy C.*, 67 Conn. App. 401, 412, 787 A.2d 592 (2001); see also *In re Shamika F.*, 256 Conn. 383, 405–406, 773 A.2d 347 (2001) ("temporary custody orders are immediately appealable not only to protect a parent's interests in their children, but also to protect the individual interests of the children"). Consequently, "[t]he issue may not be raised as a collateral attack on the judgment terminating parental rights." *In re Kachainy C.*, supra, 412; see also *In re Shamika F.*, supra, 406

("A grave injustice would be committed against children if a parent were permitted to appeal from a judgment of temporary custody long after they had established a stable relationship with foster parents"). The respondent argues, however, that she had no notice of the May 17, 2001 hearing. "[I]t is axiomatic that the right to move to open and vacate a judgment assumes that the party who is to exercise the right be given the opportunity to know that there is a judgment to open." (Internal quotation marks omitted.) *Habura* v. *Kochanowicz*, 40 Conn. App. 590, 593, 672 A.2d 512 (1996).

The respondent does not dispute, however, that she knew of the May 17, 2001 ruling at least as early as November 26, 2001, and that she failed to appeal from the ruling at that time. In addition, the respondent has never moved to open the trial court's judgment and the four-month statutory window in which to open the judgment, assuming that General Statutes § 52-212a applies, has now expired. The respondent's challenge in this proceeding, therefore, represents an impermissible collateral attack on the May 17, 2001 ruling. See *In re Shamika F.*, supra, 256 Conn. 407 (respondent's "failure to act at the time the temporary custody orders were entered does not give him a right at this late date to launch a collateral attack on the neglect and temporary custody proceedings"). Consequently, we need not review the merits of her claim. For the same reason, we need not review the merits of the respondent's claims that: (1) the trial court, at the May 17, 2001 hearing, failed to assess Jeisean's best interests, as required by § 46b-129 (k) (2), and (2) §§ 17a-111b and 46b-129 (k) (2) were facially unconstitutional or unconstitutional as applied to the facts of this case because both statutes were subsequently amended, effective October 1, 2001, to include a requirement that there be a finding by clear and convincing evidence that efforts

to reunify the parent and the child are not in the child's best interest.

The judgment of the trial court is affirmed.

In this opinion the other justices concurred.