# IN RE DAVONTA V.*
# (SC 17788)

Rogers, C. J., and Katz, Palmer, Zarella and Sullivan, Js.

Argued October 23, 2007—officially released February 12, 2008

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

*David B. Rozwaski*, for the appellant (respondent mother).

*Stephen G. Vitelli*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Susan T. Pearlman*, assistant attorney general, for the appellee (petitioner).

*Opinion*

ROGERS, C. J. This case raises the question of whether it is ever in a child's best interest to terminate his parents' rights when an adoptive family has not been secured and the child retains good relations with his extended biological family. The respondent mother appeals from the judgment of the Appellate Court upholding the judgment of the trial court based on its finding that termination of her parental rights was in the best interest of her minor child, Davonta V.[1] The respondent claims that the Appellate Court improperly concluded that the trial court's finding regarding Davonta's best interest was supported by clear and convincing evidence. We affirm the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the following procedural history. "The child, [Davonta], born April 14, 1992, was the subject of a neglect petition filed March 9, 1999, by the petitioner, the commissioner of children and families (commissioner), alleging educational, medical and physical neglect. After finding [Davonta] to be neglected, the court entered a disposition of protective supervision that allowed the respon-

---

[1] The trial court also rendered judgment terminating the parental rights of Davonta's father. Because the father did not appeal from that judgment, we refer to the mother as the respondent.

dent to have custody of [Davonta]. On August 24, 1999, protective supervision was terminated when the commissioner learned that the respondent had entered the witness protection program and relocated to North Carolina with [Davonta]. The respondent returned to Connecticut in November, 1999, and shortly thereafter the commissioner received reports of neglect concerning [Davonta]. On May 11, 2000, a neglect petition was again filed by the commissioner. An order of temporary custody was granted, stemming from the neglect petition filed in May, 2000. On October 24, 2000, [Davonta] was adjudicated neglected and committed to the care of the commissioner and placed in foster care." *In re Davonta V.*, 98 Conn. App. 42, 43–44, 907 A.2d 126 (2006).

"On December 12, 2002, the commissioner filed a petition for the termination of the respondent's parental rights. The petition alleged that [Davonta] was being denied proper care and attention and that the respondent had failed to achieve personal rehabilitation after the court previously had adjudicated [Davonta] neglected." Id., 44.

After a trial that was held over a period of several months in late 2004 and early 2005, the court found, "by clear and convincing evidence that the respondent had not achieved a reasonable degree of rehabilitation, and there is no evidence of conduct prior to or subsequent to the date of the filing of the [petition] which would encourage the belief that within a reasonable period of time, considering the age and needs of [Davonta], that [the respondent] could assume a responsible position in his life pursuant to [General Statutes] § 17a-112 (j) (3) (B)." (Internal quotation marks omitted.) Id., 45. The trial court further found, "by clear and convincing evidence that the department of children and families (department) had made reasonable efforts to reunify the respondent with her child pursuant to § 17a-112 (j)." Id.

"In the dispositional phase of the proceedings, the court considered and made the requisite factual findings pursuant to § 17a-112 (k) and determined that terminating the respondent's parental rights would be in [Davonta's] best interest. The court concluded that the evidence is clear and convincing that the best interest of [Davonta] is served by termination of [the respondent's] parental rights . . . ." (Internal quotation marks omitted.) Id.

On appeal to the Appellate Court, the respondent claimed that the trial court's finding that termination of her parental rights was in Davonta's best interest was clearly erroneous because Davonta had ties to his biological family and, at the time of termination, there was no guarantee that he would be adopted by his current foster family. See id. The Appellate Court, with one judge dissenting, *Schaller, J.*, disagreed, reasoning that the trial court's finding had sufficient evidentiary support. Thereafter, we granted the respondent's petition for certification to appeal, limited to the issue of whether "the Appellate Court improperly conclude[d] that the trial court correctly applied the appropriate standard of review in this termination of parental rights case?"[2] *In re Davonta V.*, 280 Conn. 947, 912 A.2d 480 (2006). We conclude that the Appellate Court's resolu-

---

[2] We construe the respondent's claim as an assertion that the evidence supporting the trial court's finding fell short of the requisite quantum of clear and convincing proof. To the extent that the respondent is arguing that the court did not even purport to make its finding under the correct evidentiary standard, but rather, employed the usual civil standard of preponderance of the evidence, that argument is without merit. As we indicated previously, the trial court, after making subsidiary factual findings, explicitly concluded that "the evidence is clear and convincing that the best interest of [Davonta] is served by the termination of [the respondent's] parental rights . . . ." Moreover, in reciting the applicable law at the outset of its memorandum of decision, the court identified the task it would undertake as to "consider whether the facts, as of the last day of trial, establish by clear and convincing evidence, that termination is in the child's best interest."

tion of the respondent's claim was correct and, therefore, affirm that court's judgment.

The legal framework for deciding termination petitions is well established. "[A] hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in § 17a-112 [(j) (3)][3] exists by clear and convincing evidence."[4] *In re Eden F.*, 250 Conn. 674, 688, 741 A.2d 873 (1999). "If the trial court determines that a statutory ground for termination exists, then it proceeds to the dispositional phase. During the dispositional phase, the trial court must determine whether termination is in the best interests of the child."[5] Id., 689; see also General Statutes § 17a-112 (j) (2). The best interest determination also must

---

[3] General Statutes § 17a-112 (j) (3) provides in relevant part that termination is warranted if the trial court, in the adjudicative phase, finds by clear and convincing evidence that "(B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ." The respondent does not contest the trial court's conclusion, which rested on extensive factual findings, that her failure to rehabilitate was proven by clear and convincing evidence.

[4] During the adjudicative phase, the court also must find proven, by clear and convincing evidence, that the department has made reasonable efforts to reunify the family, unless it already had been found in an earlier proceeding that such efforts no longer were appropriate. See General Statutes § 17a-112 (j) (1). The respondent does not challenge the trial court's determination that the department made reasonable efforts to reunify her with Davonta.

[5] Additionally, as part of the dispositional phase, the court must consider and make written findings concerning the seven factors set out in § 17a-112 (k). The trial court's memorandum of decision articulates the requisite findings as to each statutory factor, and the respondent does not take issue with any of those findings.

be supported by clear and convincing evidence. See *In re Eden F.*, supra, 710; see also General Statutes § 17a-112 (j) (2).

It is axiomatic that a trial court's factual findings are accorded great deference. Accordingly, an appellate tribunal will not disturb a trial court's finding that termination of parental rights is in a child's best interest unless that finding is clearly erroneous. *In re Eden F.*, supra, 250 Conn. 710. "A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made. . . .

"On appeal, our function is to determine whether the trial court's conclusion was factually supported and legally correct. . . . In doing so, however, [g]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Citations omitted; internal quotation marks omitted.) *In re Samantha C.*, 268 Conn. 614, 627–28, 847 A.2d 883 (2004).

Parental termination litigation, including the present case, often involves testimony from various child welfare professionals. "The testimony of professionals is given great weight in parental termination proceedings. . . . It is well established that [i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . The credibility and the weight of expert testimony is judged by the same standard, and the trial court is privileged to adopt whatever testimony [it] reasonably believes to be credible. . . . On appeal, we do not retry the facts or pass on the credibility of

witnesses. . . . It is the quintessential function of the fact finder to reject or accept certain evidence, and to believe or disbelieve any expert testimony. . . . The trier may accept or reject, in whole or in part, the testimony of an expert offered by one party or the other." (Citations omitted; internal quotation marks omitted.) *In re Carissa K.*, 55 Conn. App. 768, 781–82, 740 A.2d 896 (1999). Nevertheless, although the trial court may rely on expert testimony, it ultimately must make its own independent determination as to the best interest of the child. *In re Jeisean M.*, 270 Conn. 382, 398, 852 A.2d 643 (2004) ("[a]lthough we often consider the testimony of mental health experts . . . such expert testimony is not a precondition of the court's own factual judgment as to the child's best interest" [citations omitted; internal quotation marks omitted]). In sum, we must defer to both the trial court's weighing of the expert testimony presented and the trial court's independent factual determination as to what was in Davonta's best interest.

The trial court made the following findings, as set forth in its memorandum of decision, before concluding that termination of the respondent's parental rights was in Davonta's best interest. The court found that the respondent repeatedly has been absent from Davonta's life for long periods, and that Davonta has suffered through multiple foster home placements. He repeatedly has experienced the disruption of potentially permanent placements. Davonta has struggled with issues of abandonment and feelings of rejection, but remains a very adoptable child and wants to be part of a family. He needs permanency, stability, consistent nurturance, appropriate discipline, good role models and protection from the effects of uncertainty. Because Davonta is old enough to be fully cognizant of his attachment to his foster parents, removal from their home would cause him considerable emotional harm, particularly in light

of past disruptions in placement. Davonta's current foster home is a stable, loving, long-term, permanent and supportive home, and Davonta loves his foster family and has expressed his desire to remain with them forever.[6] He now is doing well emotionally and educationally. Davonta continually has expressed that he does not want to live with the respondent. He does not want to visit her or speak with her on the telephone.[7] As long as the respondent's parental rights still exist, allowing the potential for change, Davonta will be unable to truly settle in and attach to his foster parents. Davonta's foster parents are willing to allow, and have encouraged him to maintain, contact with his biological family, particularly his brother.

On the basis of the foregoing, the trial court concluded that Davonta's "best interest will be served by freeing him from the legal relationship with [the respondent] and legalizing his status so that a family . . . can provide him with the love and care he requires." The court opined further that "[t]erminating [the respondent's] parental rights would allow Davonta to have

---

[6] In making findings pursuant to the § 17a-112 (k) criteria, the trial court found that Davonta "has been continuously in foster care since June, 2002. He has had to adjust to multiple placements. Currently, he is in a therapeutic foster home. He has been placed there since August 27, 2004. He has established a very positive relationship with his current foster family and they are providing a nurturing and safe home for him. He is responding well to their nurturing and love. He has also formed a good relationship with the foster parents' biological children and other neighborhood children. The foster parents have involved him in their community and in extracurricular activities in school and sports. He knew this family for well over a year before being placed in their home. He has responded well to the structure that they have provided. Although the foster parents are not willing to be an adoptive resource for Davonta, they are committed to caring for him under long-term foster care. The foster parents report that he will be welcome in their home forever."

[7] Also as part of its § 17a-112 (k) findings, the trial court noted that the "[r]espondent mother is currently incarcerated. Davonta last had a visit with [the] respondent mother on February 20, 2004. He does not wish to see his mother and has refused to write to her."

closure. It would allow him to move on into either permanent foster care in his current and very supportive home with his current foster parents as his primary parents, or eventually, perhaps, give his consent for adoption."

In upholding the trial court's finding as to Davonta's best interest, the Appellate Court conducted a thorough review of the record and provided an extensive overview of the evidence on which the trial court had relied. In particular, the Appellate Court noted the testimony of Barbara P. Berkowitz, a psychologist and an expert in the area of child protection, parenting and family assessment as it relates to the psychology of families, concerning the negative effects on a child of instability and lack of permanence in the child's family relations; *In re Davonta V.*, supra, 98 Conn. App. 50–51; and the testimony of Jill Rusk, a foster care coordinator, as to Davonta's refusal to have contact with the respondent and his desire to remain with his foster family forever. Id., 50 n.8. In addition, the Appellate Court recognized the testimony of Barbara Stark, the commissioner's program supervisor, and Berkowitz on the concepts of closure and permanency; id., 53–54; and the respondent's testimony that she intended to seek to regain custody of Davonta in the future if her parental rights were not terminated. Id., 54 n.12.

The respondent does not dispute the existence of this supporting evidence, and we need not repeat a recitation of it here. Rather, the respondent argues, in essence, that the evidence on which the trial court relied does not amount to a clear and convincing showing by the commissioner that termination of her parental rights is in Davonta's best interest, given his positive relationships with other members of his biological family and the fact that the adoption of Davonta by his foster family is not guaranteed. The respondent, relying on the dissent from the Appellate Court opinion, claims

that in this context, the goals of permanency, stability and closure do not provide a compelling rationale for termination, and that a continuation of the status quo would better serve Davonta's best interest. We conclude that the trial court's finding has evidentiary support and is legally sound and, therefore, is not clearly erroneous such that reversal is warranted.

To begin, the Appellate Court correctly observed; see id., 49 n.6; that the law does not preclude the termination of a biological parent's rights simply because adoption of the child by new parents is not imminent. "Although subsequent adoption is the preferred outcome for a child whose biological parents have had their parental rights terminated; *In re Juvenile Appeal (83-BC)*, 189 Conn. 66, 79, 454 A.2d 1262 (1983); accord *In re Baby Girl B.*, 224 Conn. 263, 274, 618 A.2d 1 (1992); it is not a necessary prerequisite for the termination of parental rights. While long-term stability is critical to a child's future health and development; *In re Romance M.*, [229 Conn. 345, 356, 641 A.2d 378 (1941)]; adoption provides only one option for obtaining such stability." *In re Eden F.*, supra, 250 Conn. 709; see also *In re Theresa S.*, 196 Conn. 18, 30, 491 A.2d 355 (1985) ("parents' rights can be terminated without an ensuing adoption"); *In re Tyqwane V.*, 85 Conn. App. 528, 535, 857 A.2d 963 (2004) (same); *In re Dorrell R.*, 64 Conn. App. 455, 467–68, 780 A.2d 944 (2001) (same); *In re Rebecca W.*, 8 Conn. App. 92, 94–95, 510 A.2d 1017 (1986) (same). Thus, the reluctance of Davonta's foster parents to proceed with adoption at the time of the termination proceedings does not provide us with a reason to disturb the trial court's judgment.[8]

---

[8] As the Appellate Court noted, although Davonta's foster parents were not ready to pursue adoption at the time of the hearing, they indicated that "they were willing to provide a home for [Davonta] as long as he needed one . . . [and] there was no evidence presented that the foster parents were opposed to the possibility of adoption in the future." *In re Davonta V.*, supra, 98 Conn. App. 49 n.6. Our review of the record confirms that there is nothing to suggest that the foster parents decisively were opposed to

Next, although the respondent's concern that termination of her parental rights could impair Davonta's relationships with other members of his extended family, in particular his brother, is understandable, we disagree with her claim that this counsels against termination because there are no legal means for effecting ongoing familial contact.[9] Specifically, General Statutes § 17a-10a (a) places an affirmative obligation on the commissioner to ensure that children placed in the department's care and custody are provided visitation with their siblings unless otherwise ordered by a court.[10] Furthermore, General Statutes § 46b-129 (p)[11] authorizes siblings of children committed to the commissioner's custody to seek visitation orders from the court. In addition to these statutory safeguards, there is evidence in the record indicating, and the trial court so found, that Davonta's foster parents do not oppose,

adopting Davonta; rather, the relevant testimony indicates that they considered it premature. As previously indicated, the trial court found Davonta to be a very adoptable child, and further found that the foster parents reported that he would be welcome in their home forever.

[9] In her appellate brief, the respondent argues that with the termination of her parental rights, "the legal rights of all the other family members have also been severed." According to the respondent, there are "no legal means of enforcing visitation and contact between Davonta and his family members once parental rights have been terminated."

[10] Pursuant to General Statutes § 17a-10a (c), if a child in the commissioner's care or custody "has an existing relationship with a sibling and is separated from such sibling as a result of intervention by the commissioner including . . . placement in a foster home . . . the commissioner shall, based upon consideration of the best interests of the child, ensure that such child has access to and visitation rights with such sibling throughout the duration of such placement. In determining the number, frequency and duration of such visits, the commissioner shall consider the best interests of each sibling, given each child's age and developmental level and the continuation of the sibling relationship."

[11] General Statutes § 46b-129 (p) provides: "Upon motion of any sibling of any child committed to the Department of Children and Families pursuant to this section, such sibling shall have the right to be heard concerning visitation with, and placement of, any such child. In awarding any visitation or modifying any placement, the court shall be guided by the best interests of all siblings affected by such determination."

and in fact have encouraged, that he maintain his relationships with his biological family.[12]

Finally, we agree with the Appellate Court that the trial court, in crediting the testimony of the child welfare professionals and terminating the respondent's parental rights on the basis of Davonta's need for stability, permanence and closure, was not merely invoking "empty incantations," as the respondent has claimed. *In re Davonta V.*, supra, 98 Conn. App. 53. This court has "noted consistently the importance of permanency in children's lives. *In re Juvenile Appeal (Anonymous)*, 181 Conn. 638, 646, 436 A.2d 290 (1980) (removing child from foster home or further delaying permanency would be inconsistent with his best interest); *In re Victoria B.*, 79 Conn. App. 245, 263, 829 A.2d 855 (2003) (trial court's findings were not clearly erroneous where much of child's short life had been spent in custody of [commissioner] and child needed stability and permanency in her life); *In re Teshea D.*, [9 Conn. App. 490, 493–94, 519 A.2d 1232 (1987)] (child's need for permanency in her life lends added support to the court's finding that her best interest warranted termination of the respondent's parental rights). Virtually all experts, from many different professional disciplines, agree that children need and benefit from continuous, stable home environments." (Internal quotation marks omitted.) *In re Jeisean M.*, supra, 270 Conn. 400–401.

"[S]table and continuous care givers are important to normal child development. Children need secure and

---

[12] As part of its best interests determination, the trial court found: "The foster parents are willing to allow, and encourage Davonta to maintain contact with those members of his biological family that he wants to continue to have contact with; namely, his brother [K], his maternal aunt, and his maternal grandmother." The court noted the maternal aunt's testimony that "she recognizes that Davonta is happy where he is, he wants to stay in his current foster home where he has been doing exceptionally well and she supports Davonta in his desire to remain where he is . . . ."

uninterrupted emotional relationships with the adults who are responsible for their care." 3 D. Kramer, Legal Rights of Children (2d Ed. Rev. 2005) § 29:11, p. 185; see also J. Goldstein et al., The Best Interests of the Child: The Least Detrimental Alternative (1996) p. 19 ("[c]ontinuity of relationships is essential for a child's healthy development"); see also *In re Hanks*, 553 A.2d 1171, 1178 (Del. 1989) ("[N]o child can grow emotionally while in limbo, never really belonging to anyone except on a temporary and ill-defined or partial basis. . . . To grow, the child needs at least the promise of permanency in relationships and some continuity of environment." [Internal quotation marks omitted.]). "Repeatedly disrupted placements and relationships can interfere with the children's ability to form normal relationships when they become adults." 3 D. Kramer, supra, p. 185.

In regard to children who have bonded with their foster parents, "[o]nce new psychological relationships form, separation from the new parents becomes no less painful and no less damaging to a child than separation from natural or adoptive caregiving parents. Indeed, to the extent that such separations are repeated (as in multiple foster care placements), they make the child more vulnerable and make each subsequent opportunity for attachment less promising and less trustworthy than prior ones." J. Goldstein et al., supra, pp. 104–105. Termination of a biological parent's rights, by preventing further litigation with that parent, can preserve the stability a child has acquired in a successful foster placement and, furthermore, move the child closer toward securing permanence by removing barriers to adoption. See 3 D. Kramer, supra, § 28:2, p. 17. Even if no adoption is forthcoming, termination can aid stability and lessen disruption because a parent whose rights have been terminated no longer may file a motion to revoke the commitment of the child to the custody of

the commissioner; see General Statutes § 46b-129 (m); or oppose an annual permanency plan. See General Statutes § 46b-129 (k).

The testimony before the trial court, on which it was privileged to rely, essentially reflected these considerations in relation to Davonta's best interest, specifically, his need for permanence and stability. There also was evidence before the court as to Davonta's previous placements and the trauma he experienced when they were disrupted.[13] Moreover, the respondent's testimony indicated that she would pursue regaining custody of Davonta in the future, although at the time of her testimony, he had not lived with her for more than four years and had refused all contact with her for nearly one year.[14] In light of these considerations, we are unable to conclude that the evidence of Davonta's need for permanence and stability, viewed in the context of the entire record, does not clearly and convincingly establish that termination of the respondent's parental rights was in Davonta's best interest. Consequently, the trial court's finding as to Davonta's best interest is not clearly erroneous. See *Adoption of Nancy*, 443 Mass. 512, 517, 822 N.E.2d 1179 (2005) (terminating father's parental rights where children were happy in foster care, though

[13] The trial court's memorandum of decision recounts Davonta's placement history. It reflects that when, due to reports of abusive physical punishment, Davonta was removed from his first foster home in 2002, after living there for two years, he "presented with significant emotional and behavioral concerns," "had a very difficult time adjusting to [a] safe home," and "displayed oppositional and aggressive behaviors." At the conclusion of a second failed placement, which disrupted because of the foster mother's cohabitation with a man with an extensive criminal history, "Davonta did not want to be removed [and] [o]n the day of his removal he refused so strenuously that he had to be hospitalized." Although the commissioner's previous failure to secure appropriate placements for Davonta is not a circumstance directly attributable to the respondent, the trial court properly considered Davonta's response to these disruptions as part of the overall situation to determine what was in his best interest in light of his demonstrated vulnerability.

[14] At the time of the hearing, Davonta was twelve years old.

no adoptions imminent and children's counsel opposed termination, because "[s]tability in the lives of children is important, particularly in a case that has continued for a long period of time in the hope that the father could and would successfully rehabilitate himself . . . [and in which] permanence and stability . . . will be eased by termination of their father's rights" [citations omitted]); *In re Custody & Parental Rights of F.M.*, 305 Mont. 189, 193, 24 P.3d 208 (2001) (crediting testimony of experts that termination of mother's parental rights and children's placement in long-term foster care was in children's best interests because they "are in need of permanency and stability in their lives in order to effectively progress in their therapy and the continued fantasy of being returned to their mother's care someday was detrimental to the therapeutic process").

The balancing of interests in a case involving termination of parental rights is a delicate task and, when supporting evidence is not lacking, the trial court's ultimate determination as to a child's best interest is entitled to the utmost deference. The Appellate Court aptly described the process: "Although a judge [charged with determining whether termination of parental rights is in a child's best interest] is guided by legal principles, the ultimate decision [whether termination is justified] is intensely human. It is the judge in the courtroom who looks the witnesses in the eye, interprets their body language, listens to the inflections in their voices and otherwise assesses the subtleties that are not conveyed in the cold transcript." *In re Davonta V.*, supra, 98 Conn. App. 43. Because the trial court's finding as to Davonta's best interest is factually supported and legally sound, we will not substitute our judgment for that of the trial court.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.