******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# IN RE DYNASTIE D.*
## (AC 48218)

Alvord, Westbrook and Wilson, Js.

### *Syllabus*

The minor child, who had been adjudicated neglected and committed to the custody of the petitioner, the Commissioner of Children and Families, appealed from the trial court's judgment granting the petitioner's motion for the out-of-state placement of the child. The child claimed, inter alia, that the court failed to follow the requirements of the statute ((Rev. to 2023) § 46b-129 (j) (4)) governing out-of-state placements by the petitioner. *Held*:

This court concluded that, in determining whether the petitioner has demonstrated good cause for the out-of-state placement of a child pursuant to § 46b-129 (j) (4), the trial court should balance the expected well-being of the child in the proposed out-of-state placement with that of the child were he or she to remain in Connecticut, which is an independent determination from the best interest of the child.

The trial court did not abuse its discretion in concluding that the petitioner demonstrated good cause pursuant to § 46b-129 (j) (4) for the child's placement in Florida, as the court properly weighed relevant factors in its good cause determination and the determination was adequately supported by evidence in the record.

The trial court properly placed the burden of proof for good cause on the petitioner as, despite the court's isolated use of imprecise language in its oral decision, the challenged language merely reflected the court's assessment of the evidence offered by the child to the court as part of its determination of whether the petitioner had met its burden with respect to good cause, and the single challenged sentence was not enough to overcome the presumption that the court knows and has applied the law correctly.

The trial court's factual findings challenged by the child were not clearly erroneous, as they were supported by evidence in the record, and there was ample evidence in the record, not challenged by the child, supporting the court's ultimate conclusion that there was good cause to place the child outside the state.

Argued April 14—officially released July 10, 2025**

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the court.

** July 10, 2025, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*Procedural History*

Petition by the Commissioner of Children and Families to adjudicate the respondent parents' minor child neglected, brought to the Superior Court in the judicial district of Stamford-Norwalk, Juvenile Matters, and transferred to the Superior Court in the judicial district of Fairfield, Juvenile Matters, where the respondent parents were defaulted; thereafter, the court, *Skyers, J.*, rendered judgment adjudicating the minor child neglected and committing the minor child to the custody of the petitioner; subsequently, the court granted the petitioner's motion for the out-of-state placement of the minor child, and the minor child appealed to this court. *Affirmed.*

*Karen Oliver Damboise*, assistant public defender, for the appellant (minor child).

*Nisa Khan*, assistant attorney general, with whom were *Patrick Kelly-Hauser*, assistant attorney general, and, on the brief, *William Tong*, attorney general, for the appellee (petitioner).

*Opinion*

WILSON, J. This appeal, brought by the minor child, Dynastie D., arises from the trial court's judgment rendered in favor of the petitioner, the Commissioner of Children and Families, granting her motion for out-of-state placement of the child.[1] On appeal, the child claims that (1) the trial court failed to follow the statutory requirements of General Statutes (Rev. to 2023) § 46b-129 (j) (4),[2] and (2) the trial court's determination that there was good cause to place the child outside the

---

[1] Although counsel for both the respondent mother and the respondent father have appearances in this matter, neither has filed a brief or otherwise participated in the present appeal.

[2] General Statutes (Rev. to 2023) § 46b-129 (j) (4) provides in relevant part: "The commissioner may place any child or youth so committed to the commissioner in a suitable foster home or in the home of a fictive kin caregiver, relative caregiver, or in a licensed child-caring institution or in the care and custody of any accredited, licensed or approved child-caring agency, within or without the state, provided a child shall not be placed

state was not supported by the evidence. We disagree and, accordingly, affirm the judgment of the trial court.

The following undisputed facts and procedural history are relevant to the resolution of this appeal. The child was born in February, 2023. On the same day, the Department of Children and Families (department), which had a prior history with the respondent mother (mother), invoked a ninety-six hour hold on behalf of the child. Soon after, the petitioner filed a neglect petition, as well as a motion for an ex parte order of temporary custody, which was granted by the court, *Maronich*, *J.*, and the child was placed with maternal relative foster parents (foster parents). The court, *McLaughlin*, *J.*, sustained the order of temporary custody on February 24, 2023.

Paternity was established on April 20, 2023. Following the establishment of paternity, in October, 2023, the petitioner submitted an application pursuant to the Interstate Compact on the Placement of Children (compact)[3] and General Statutes § 17a-175[4] for review of the

_____

outside the state except for good cause and unless the parents or guardian of such child are notified in advance of such placement and given an opportunity to be heard, or in a receiving home maintained and operated by the commissioner. . . .”

The legislature has amended § 46b-129 since the events at issue and the contents of what had been § 46b-129 (j) (4) are now located in General Statutes § 46b-129 (j) (5). See Public Acts 2024, No. 24-126, § 5. All references to § 46b-129 in this opinion are to the 2023 revision of the statute, which was in effect when the motion for out-of-state placement was filed.

[3] “As background, Connecticut adopted the [compact] in 1967 and codified it as § 17a-175. All fifty states, the District of Columbia and the U.S. Virgin Islands have enacted the compact. . . . Article I of the compact provides in relevant part that [i]t is the purpose and policy of the party states to cooperate with each other in the interstate placement of children to the end that . . . (a) [e]ach child requiring placement shall receive the maximum opportunity to be placed in a suitable environment and with persons or institutions having appropriate qualifications and facilities to provide a necessary and desirable degree and type of care. . . . General Statutes § 17a-175, art. I (a).” (Citation omitted; internal quotation marks omitted.) *In re Amanda C.*, 218 Conn. App. 731, 741–42, 292 A.3d 1269, cert. denied, 347 Conn. 904, 297 A.3d 567 (2023).

[4] General Statutes § 17a-175, article III, provides: “(a) No sending state shall send, bring, or cause to be sent or brought into any other party state

child's paternal grandparents,[5] who reside in Florida, as a long-term placement resource for the child. On November 30, 2023, the respondent parents (parents) were defaulted with respect to the neglect petition and the court, *Skyers, J.*, adjudicated the child neglected and committed her to the custody of the petitioner.

On December 8, 2023, the petitioner filed a permanency plan recommending termination of parental rights and adoption or permanent transfer of guardianship to the paternal grandparents. In the study in support of the permanency plan,[6] the petitioner represented

any child for placement in foster care or as a preliminary to a possible adoption unless the sending agency shall comply with each and every requirement set forth in this article and with the applicable laws of the receiving state governing the placement of children therein.

"(b) Prior to sending, bringing or causing any child to be sent or brought into a receiving state for placement in foster care or as a preliminary to a possible adoption, the sending agency shall furnish the appropriate public authorities in the receiving state written notice of the intention to send, bring, or place the child in the receiving state. The notice shall contain:

"(1) The name, date and place of birth of the child.

"(2) The identity and address or addresses of the parents or legal guardian.

"(3) The name and address of the person, agency or institution to or with which the sending agency proposes to send, bring, or place the child.

"(4) A full statement of the reasons for such proposed action and evidence of the authority pursuant to which the placement is proposed to be made.

"(c) Any public officer or agency in a receiving state which is in receipt of a notice pursuant to paragraph (b) of this article may request of the sending agency, or any other appropriate officer or agency of or in the sending agency's state, and shall be entitled to receive therefrom, such supporting or additional information as it may deem necessary under the circumstances to carry out the purpose and policy of this compact.

"(d) The child shall not be sent, brought, or caused to be sent or brought into the receiving state until the appropriate public authorities in the receiving state shall notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child."

[5] The record reflects that the paternal grandmother's husband is the stepfather of the child's father. We refer to these individuals as the child's paternal grandparents, as did the trial court.

[6] We note that the study in support of the permanency plan dated October 24, 2023, was admitted as exhibit B at the hearing on the motion for out-of-state placement. This study corresponds with the permanency plan filed on December 8, 2023, by the petitioner recommending termination of parental rights and adoption or permanent transfer of guardianship to the paternal

that both parents agreed to the child being placed in Florida with the paternal grandparents and stated that they will eventually relocate to Florida. On December 21, 2023, the child filed an objection to the permanency plan. At a case status conference held on January 23, 2024, the attorney for the minor child advocated that the child remain in her current placement. On January 30, 2024, the child withdrew her objection to the permanency plan. On February 6, 2024, the attorney for the minor child submitted a position letter in which she represented that "an agreement has been reached in that [the department] will amend the permanency plan to reflect a [termination of parental rights] and an adoption with no placement source identified in the plan." Thereafter, on February 7, 2024, the petitioner filed a motion to amend the permanency plan to reflect termination of parental rights and adoption.

At the hearing on the permanency plan on February 9, 2024, the court, *McLaughlin, J.*, approved the amended permanency plan and ordered the petitioner to file a petition for termination of parental rights within sixty days.[7] On April 23, 2024, the petitioner notified the court that the application pursuant to the compact for an evaluation of the paternal grandparents as a placement option was approved, the Florida Department of Social Services was ready to accept placement of the child, and the paternal grandparents agreed to accept placement of the child and provide her with permanency via adoption.

grandparents. The permanency plan was later amended to reflect termination of parental rights and an adoption with no placement source identified in the plan. An amended study in support of the permanency plan, dated January 29, 2024, was also filed with the court. The two plans are nearly identical, with the key difference being the lack of a specific placement source in the amended study. We continue to refer to exhibit B, the study in support of the permanency plan dated October 24, 2023, in our discussion of the child's claim herein.

[7] On February 3, 2025, after the filing of this appeal, the petitioner filed a petition for the termination of parental rights as to both parents. The petition remains pending.

On April 30, 2024, the petitioner, pursuant to § 46b-129 (j) (4), filed a motion for the out-of-state placement of the child with the paternal grandparents in Florida, asserting that there were no other appropriate relative resources for the child in Connecticut and that the out-of-state placement was in the best interest of the child. The child objected to the motion, arguing that placement in Florida with the paternal grandparents was not in her best interest. The child stated that she had been in the care of the foster parents since birth and was thriving in her current placement. Regarding the proposed placement, the child argued that she had "not bonded with the paternal grandparents, [did] not have a relationship with the paternal grandparents and, moreover, moving [her] to a new environment and with new caretakers with whom she has only met in person during two supervised visitation sessions with the [respondent] father [(father)] would cause [her] emotional and psychological damage . . . ." On June 6, 2024, the child filed a motion for an interactional evaluation, requesting the court to order "that the child and her foster parents participate in a foster parent-child interactional evaluation with a clinical interview performed by a clinical psychologist for purposes of assessing the attachment bond between the foster parents and the child." The petitioner objected to the child's motion as an untimely request for expert discovery. Thereafter, the court denied the child's motion as untimely.

A hearing on the motion for out-of-state placement was held over three days: June 7 and September 13 and 20, 2024. Both the petitioner and the child introduced several exhibits that were admitted into evidence, and the court heard testimony from Tania Mayen, the family's social worker; the child's paternal grandmother; the child's foster mother; and the child's foster father.

On October 18, 2024, the court, *Skyers*, *J.*, granted the motion for out-of-state placement. In its oral decision, the court made the following relevant findings: "[The mother] has not addressed her mental health needs, her physical health, [intimate partner violence] and parenting needs, all factors that contributed to her inability to parent the [child]. [The father] reportedly was unemployed and transient between New York and Connecticut. He further reported that he was not in a position to care for his child. [The father] identified [the paternal grandmother] as a potential placement resource for [the child]. At the beginning of this case, paternity had not yet been established. Therefore, any assessment as to the suitability of [the] paternal grandparents as a resource was deferred until after paternity had been confirmed. As stated above, paternity was confirmed April 20th, 2023. . . .

"During the trial, [Mayen] testified that early in the process the case plan was for [the child] to be placed with the paternal grandparents in Florida. The parents acknowledg[ed] that they were unable to care for [the child], agreed with the department on the proposed placement and did not object to the plan. They also indicated that they eventually intended to relocate to Florida to be closer to [the child] and the paternal family. [The paternal grandmother] credibly testified that shortly after being made aware of [the child's] paternity, she contacted [the department] so she could be considered as a resource for long-term placement. [The paternal grandmother] works as a registered nurse and lives with [the paternal grandfather] and two sons . . . in . . . Florida. Her home was assessed by the state of Florida, and she began the process for approval. [The paternal grandmother] testified that she would be able to provide [the child's] needs and give her permanency. And she communicated that she wanted to adopt [the child]. . . .

"[The paternal grandmother] testified that her main concern would be to provide a stable home for [the child's] safety and well-being. She testified that [she is] willing to have [the child] get to know [the father], but [the father] would not be living with them. [The paternal grandmother] had regular and consistent weekly video calls with [the child] that were facilitated by [the father] during his visitation time. [The paternal grandmother] and [the paternal grandfather], along with [the paternal grandmother's] two sons, her sister-in-law and [the father] visited with [the child] in Connecticut in July, 2023. Her last visit with [the child] was in September, 2024, with [the paternal grandfather], her sons and other extended family in New York. She clearly loves [the child] and wishes to assume care for her in her home. [The paternal grandmother] had planned to take [the child] for a visit in Florida in July . . . 2024. However, that visit did not take place due to the [court's] procedural process.

"[The foster mother] credibly testified that she and her family love [the child]. They have a clear bond with her. And she and [the foster father] would be willing to adopt [the child]. The [compact] process began in July, 2023, and ended April, 2024. The court recognizes the length of time in the approval process. In addition, the lengthy court procedural process added to the delay in decisions regarding [the child's] permanency.

"[The child] is very fortunate to have two possible placements. Generally, questions of custodial placement are resolved by determination of what is in the best interest of the child as shown by a fair preponderance of the evidence. . . . To determine whether a custodial placement is in the best interest of the child, the court uses its broad discretion to choose a place that will foster the child's best interest and sustain growth, development, well-being, and the continuity and stability of his environment. . . .

"The court finds that placement with [the] paternal grandparents is in [the child's] best interest and will allow [the child] to maintain a connection with her paternal family while still hav[ing] the opportunity to maintain a connection with her [father] and [mother]. [The child] has offered insufficient evidence for the court to conclude that the decision to place [the child] with her [paternal] grandparents in Florida is inconsistent with her best interests, nor to conclude that to do so would be detrimental to her best interest.

"The court would be remiss in not acknowledging the care the foster parents had given to [the child]. The . . . foster parents have a loving bond with [the child] and [it] is clear from the testimony that they have nurtured and cared for her during the time of her placement. Indeed, the court notes that it is this loving and sustaining care that will help [the child] transition more easily to her paternal . . . grandparents in Florida. The court therefore grants the [petitioner's] motion for out-of-state placement." (Citations omitted.)[8]

On November 13, 2024, the petitioner filed a motion requesting the trial court to articulate whether it made a finding, when it granted the motion for out-of-state placement, that there was good cause to place the child

---

[8] On November 5, 2024, the child filed a motion for a discretionary stay of the trial court's order granting the motion for out-of-state placement. The court denied the motion on November 7, 2024. On November 8, 2024, the child filed a motion for review of the trial court's order denying her motion for a discretionary stay with this court. On November 12, 2024, this court, sua sponte, ordered that the trial court's order granting the petitioner's motion for out-of-state placement be stayed pending this court's resolution of the child's motion for review of the trial court's order denying her motion for a discretionary stay. On November 15, 2024, this court granted the motion for review but denied the relief requested and lifted the temporary stay. One judge dissented from the lifting of the temporary stay pending appeal. On November 25, 2024, the child filed a motion for reconsideration en banc of this court's decision denying her requested relief of an appellate stay of the trial court's order granting the motion for out-of-state placement. On December 18, 2024, this court, with one judge dissenting, denied the motion for reconsideration en banc.

outside the state, as required by § 46b-129 (j) (4). In its articulation, issued November 13, 2024, the court further found that "[t]he foster parents were aware that the paternal grandmother was being evaluated as a placement resource. Both parents . . . were in agreement with placing [the child] in Florida with the paternal grandmother. The [compact] application was approved April 23, 2024. [The child] has met the paternal grandmother and the extended family. [The child] has had in person visits with the paternal grandmother, [the paternal] grandfather and their two sons. In addition, [the child] has weekly virtual visits with the paternal grandmother." The court then stated that "[t]he same facts that the court used in its finding of best interests do hereby support the finding of good cause. The court finds there is good cause for placing the child outside the state of Connecticut to be with her paternal grandparents in the state of Florida because it will allow [the child] the opportunity to maintain a connection with her [paternal] grandparents and extended paternal family." This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The child first claims that the court failed to follow the statutory requirements of § 46b-129 (j) (4). In connection with this claim, the child raises two distinct subclaims: that the court (1) failed to apply the proper standard in determining good cause because "[t]he court did not discuss, nor apparently consider, [the child's] attachment to her . . . foster parents, the possible harm that the change in placement would cause, or any other factors, other than maintaining a connection with the parents, whose approved permanency plan was termination of parental rights" and (2) impermissibly shifted the burden of proof from the petitioner to her.[9] For the reasons that follow, we disagree.

[9] The child additionally claims that the court impermissibly made findings without the benefit of expert testimony. This claim appears in her principal

### A

We first address the child's claim that the court improperly applied the good cause standard under § 46b-129 (j) (4). Before we reach the merits of the child's claim, we must first interpret the phrase "good cause" as used in § 46b-129 (j) (4), as doing so is necessary to our resolution of the child's claim. The interpretation of "good cause" in this context is an issue of first impression for this court.

As this involves an issue of statutory interpretation, our review is plenary. See *Reverse Mortgage Solutions, Inc.* v. *Widow(er), Heir(s) and/or Creditors of the Estate of Beryl E. Rowland*, 231 Conn. App. 761, 770, 334 A.3d 1054 (2025). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) *Sicignano* v. *Pearce*, 228 Conn. App. 664, 682, 325 A.3d 1127 (2024), cert. denied, 351 Conn. 908, 330 A.3d 881 (2025).

Our analysis begins with the text of § 46b-129 (j) (4), which provides in relevant part: "The commissioner

appellate brief as part of her primary claim that the court failed to follow the statutory requirements of § 46b-129 (j) (4). We address this claim in part II of this opinion, as it is intertwined with the child's claim that the court's determination as to good cause was not supported by the evidence.

may place any child or youth so committed to the commissioner in a suitable foster home or in the home of a fictive kin caregiver, relative caregiver, or in a licensed child-caring institution or in the care and custody of any accredited, licensed or approved child-caring agency, within or without the state, provided a child shall not be placed outside the state *except for good cause* and unless the parents or guardian of such child are notified in advance of such placement and given an opportunity to be heard, or in a receiving home maintained and operated by the commissioner. . . .'' (Emphasis added.) General Statutes (Rev. to 2023) § 46b-129 (j) (4).

The phrase "good cause" is not defined in § 46b-129 (j) (4), nor anywhere in title 46b of the General Statutes. In the absence of any statutory definition, we construe the term "good cause" in accordance with the commonly approved usage of the language. See *Pasquariello* v. *Stop & Shop Cos.*, 281 Conn. 656, 665, 916 A.2d 803 (2007). At the time that § 46b-129 (j) (4) was amended to include a requirement of "good cause" for out-of-state placements, "good cause" was defined to mean a "[s]ubstantial reason, one that affords legal excuse" or a "[l]egally sufficient ground or reason." Black's Law Dictionary (4th Ed. 1968) p. 822. Thus, the statute prescribes that the petitioner must demonstrate a "[l]egally sufficient ground or reason" to warrant the out-of-state placement of the child. This definition, however, provides little guidance as to its application in this context.

In seeking to clarify what may constitute good cause as the term is used in § 46b-129 (j) (4), we are mindful that the silence of the statute itself provides some interpretive guidance. For example, in the context of visitation orders pursuant to General Statutes § 46b-56 (b), this court has construed the lack of a statutory definition to indicate that the term implicates the discretion of the trial court. See *Cardona* v. *Padilla*, 230 Conn.

App. 534, 552, 330 A.3d 912 (2025). In so concluding, this court observed that "child custody determination[s] [are] dependent on the factual circumstances of a given case" as well as the established principle that "decision-making in family disputes requires flexible, individualized adjudication of the particular facts of each case without the constraint of objective guidelines." (Internal quotation marks omitted.) Id., 551–52. Likewise, whether to place a child outside the state is a fact intensive inquiry for the trial court, "which has the parties before it and is in the best position to analyze all of the factors which go into the ultimate conclusion that [there is good cause to support the out-of-state placement]." (Internal quotation marks omitted.) *In re Ava W.*, 336 Conn. 545, 589, 248 A.3d 675 (2020); see id. (discussing posttermination visitation orders). Thus, we conclude that the lack of a specific statutory definition of "good cause" here suggests that the legislature intended for the court to exercise its broad discretion in determining, when considering the particular factual circumstances of each case, what "[l]egally sufficient ground or reason" or good cause warrants the out-of-state placement of a child.[10] See, e.g., *Kelsey* v. *Commissioner of Correction*, 329 Conn. 711, 723, 189 A.3d 578 (2018) (in context of habeas proceeding, concluding that lack of specific statutory contours as to statutory phrase suggests that legislature intended for court to exercise its discretion).

The discretion of the trial court, however, must be exercised within the context of the applicable statutory provision. See, e.g., *Kelsey* v. *Commissioner of Correction*, 202 Conn. App. 21, 33, 244 A.3d 171 (2020) ("[i]n attempting to synthesize a more fulsome definition of

---

[10] Therefore, to the extent that the child invites this court to articulate mandatory factors the trial court must consider in determining good cause, we decline to do so. See *In re D'Andre T.*, 201 Conn. App. 396, 408–409, 242 A.3d 766, cert. denied, 336 Conn. 902, 242 A.3d 480 (2020).

good cause as that term is used [in the statute], we are mindful that the statute itself provides some interpretive guidance"), aff'd, 343 Conn. 424, 274 A.3d 85 (2022). Section 46b-129 (j) (4) applies in the narrow circumstance where the *Commissioner of Children and Families* seeks to place a child *committed to the commissioner's care and custody* outside of the state. In other words, although "[g]enerally, questions of custodial placement are resolved by a determination of what is in the best interest of the child . . . as shown by a fair preponderance of the evidence"; (internal quotation marks omitted) *In re Haley B.*, 81 Conn. App. 62, 65, 838 A.2d 1006 (2004); § 46b-129 (j) (4) imposes an additional requirement of "good cause" where a child has been removed from the care of her parent or guardian and committed to the petitioner, who then seeks to place the child outside the state.

The parties agree, as do we, that good cause and best interest of the child are *not* synonymous. See *Felician Sisters of St. Francis of Connecticut, Inc.* v. *Historic District Commission*, 284 Conn. 838, 850, 937 A.2d 39 (2008) ("[t]he use of the different terms . . . within the same statute suggests that the legislature acted with complete awareness of their different meanings . . . and that it intended the terms to have different meanings" (internal quotation marks omitted)). Although the factual basis of a good cause determination may overlap with that of the best interest determination, we recommend that trial courts evaluate these issues independently. See, e.g., *In re Joel H.*, Docket No. CP-18-023577-A, 2024 WL 575942, *12 (Conn. Super. January 24, 2024). By requiring a showing of a good cause for justification of an out-of-state placement, which is distinct from the typical best interest of the child determination associated with custody placements, the legislative intent behind the words "good cause" suggests that such a

determination would involve a weighing of the well-being of the child if placed outside the state with that of the child if she remained in Connecticut.

Several trial courts have had occasion to make a good cause determination in this context, which we find instructive. In *In re Joel H.*, supra, 2024 WL 575942, the trial court considered the petitioner's petitions for termination of parental rights for two children, Saria and her half-sibling Joel, as well as the petitioner's motion for out-of-state placement of Saria. Id., *1. In that case, Joel had been adjudicated neglected in 2018 and removed from his mother's care in 2019. Id. Saria, who shared the same mother as Joel, was born in 2021. Id. Soon after her birth, an order of temporary custody was granted, and she was adjudicated neglected and committed to the custody of the petitioner. Id. In 2023, Joel moved to a new, out-of-state placement in Florida, with his paternal half-sibling's mother, S. Id., *5. The trial court granted the termination of the parental rights of the children's mother, as well as the parental rights of the children's respective fathers. Id., *1. The court then addressed the petitioner's motion for out-of-state placement, which sought to place Saria with S in Florida. Id., *12. The court observed that this placement would permit Joel and Saria to be together. Id. In concluding that the petitioner had shown good cause for the out-of-state placement, the court considered whether S was a suitable and worthy guardian, that Saria had visited with and was comfortable with S, that Saria would be placed with Joel and his half-siblings, and that S was willing to foster bonds between the children and their biological and prior foster families. Id. The court also acknowledged the position of the nonparty foster parents, who submitted a letter in opposition to the motion for out-of-state placement and expressed their wish for Saria to remain in their care, but concluded that "[t]heir love and care for Saria, however,

do not override the statutory analysis set forth above." Id., *12 n.3.

In *In re Caydence B.*, Docket No. CP-16-011676-A, 2016 WL 7975675 (Conn. Super. November 28, 2016), the court considered, in addition to the petitioner's neglect petition, a motion for out-of-state placement filed by the intervening paternal aunt. Id., *2. In considering the motion, the court evaluated the quality of the child's relationships in Connecticut as well as in the proposed placement state, finding that "[p]lacing the child with [the paternal aunt], however, would make contact with her parents and all of her Connecticut relatives more difficult. The child has lived all her life in Connecticut and in the home of maternal grandparents from birth until the [order of temporary custody]. She has many paternal and maternal relatives in this state, and the connectivity of family and kin would thus seem to be strongest in this state." Id., *6. This was outweighed, however, by the suitability of the paternal aunt, who had "consistently shown herself to be ready to care for the child and committed to providing her with permanency if necessary" and had a strong bond with the child. Id., *7. The court weighed the suitability of the paternal aunt against that of the only possible Connecticut placement option, the maternal great-grandmother, who "show[ed] significantly less commitment to the child in comparison to the [paternal aunt], as well as raising substantial doubt about her readiness, willingness, and desire to provide a permanent home for the child . . . ." Id. In finding good cause to place the child outside the state with the paternal aunt, the court necessarily referred to its own findings and credibility determinations from witness testimony. Id., *8.

Finally, in *In re Christopher C.*, Docket No. CP-23-013514-A, 2024 WL 3665347 (Conn. Super. July 2, 2024), aff'd, 232 Conn. App. 104, cert. denied, 352 Conn. 903

(2025), the trial court denied a father's motion for out-of-state placement of his child with the child's paternal grandmother. The court found that no good cause existed to place the child outside the state nor was the placement in the child's best interest. Id., *3. In reaching its conclusion as to good cause, the court weighed the testimony and evidence presented before it, which demonstrated several concerns raised as to the suitability of the proposed placement, such as the paternal grandmother's judgment, level of collaboration with the department, and ability to protect the child, and that the placement would separate the child from his half-sibling. Id., *2–3.

In each of these cases, the court balanced the well-being of the child if placed outside the state with that of the child if the child were to have remained in Connecticut.[11] In doing so, the court appropriately considered different, case specific facts. Essential to the court's good cause analysis in each case were the court's own assessments of the child's current and/or proposed placements, which required credibility determinations and a weighing of the evidence before it.

On the basis of the authorities we have discussed and the legal principles arising therefrom, we conclude that, in determining whether the petitioner has demonstrated good cause pursuant to § 46b-129 (j) (4), the trial court should balance the expected well-being of the child in the proposed out-of-state placement with that of the child were she to remain in Connecticut. Although it is impossible to provide a comprehensive list of circumstances that could satisfy the good cause standard, a trial court properly may elect to consider

---

[11] We note that in *In re Christopher C.*, supra, 2024 WL 3665347, and *In re Caydence B.*, supra, 2016 WL 7975675, the party moving for out-of-state placement pursuant to § 46b-129 (j) (4) was one other than the petitioner. As the moving party here is the petitioner, as contemplated by the statute, that difference has no bearing on the merits of this appeal.

a number of factors in determining whether a petitioner has met its evidentiary burden of establishing good cause to place the child outside the state. As examples, which are neither exclusive nor all-inclusive, a trial court may wish to consider the suitability of the proposed out-of-state placement; the quality of the child's relationships with individuals in Connecticut or geographically close to Connecticut and within the proposed out-of-state placement; the child's or the parent's preferences where appropriate; the strength of the emotional bond between the child and the current in-state placement; the opportunity for the child to form a bond with the proposed placement; and the impact the out-of-state placement may have on the child. Trial courts should, of course, evaluate these considerations *independently* from their best interest of the child determination.[12]

---

[12] The child argues that, in this case, "[r]emand is appropriate because this court is setting forth, for the first time, the standard and potential considerations for trial courts to consider when evaluating good cause in a motion for out-of-state placement. See *In re Ava W.*, [supra] 336 Conn. [588–89]." The petitioner argues that, should this court set forth further guidance for trial courts in considering a motion for out-of-state placement, remand is not necessary because, unlike in *In re Ava W.*, this court is not setting forth a new standard but, rather, only providing additional, permissive considerations under the pre-existing standard of good cause pursuant to § 46b-129 (j) (4). We agree with the petitioner. In *In re Ava W.*, supra, 545, our Supreme Court held, for the first time, that a trial court has the authority to consider a motion for posttermination visitation when the court considers termination of parental rights. Id., 572–73. The court also set forth the applicable legal standard, derived from the authority granted to trial courts by statute, and potential factors for trial courts to consider when evaluating these motions. Id., 588–89. The court further concluded that "remand is appropriate in the present case because we are setting forth, for the first time, the standard and potential considerations for trial courts to consider when evaluating whether posttermination visitation should be ordered within the context of a termination proceeding. See *Cefaratti* v. *Aranow*, 321 Conn. 593, 625, 141 A.3d 752 (2016) (remanding case after adopting new standard to afford plaintiff opportunity to present evidence)." *In re Ava W.*, supra, 588–89. Here, unlike the court in *In re Ava W.*, we are not setting forth a new legal standard; rather, we are clarifying the existing good cause standard by providing permissive factors for trial courts to consider in their good cause determination. Accordingly, we need not remand for further

B

Having addressed the parties' arguments as to the good cause standard, we now address the merits of the child's claim that the court improperly applied the good cause standard under § 46b-129 (j) (4) when it "utiliz[ed] the factor of establishing and maintaining a connection with the paternal family, over and above the maternal family." Specifically, the child argues that the court improperly failed to consider "[the child's] attachment to her Connecticut relative foster parents, the possible harm that the change in placement would cause, or any other factors, other than maintaining a connection with the parents, whose approved permanency plan was termination of parental rights."

We begin with our standard of review. This claim challenges a trial court's determination of whether the petitioner has satisfied good cause which, as discussed previously, requires a weighing of various facts and circumstances offered to justify the out-of-state placement, including an evaluation of any witness testimony. Because such determination invokes the discretion of the trial court, it is reversible only for an abuse of discretion. "In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did. . . . [G]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence. . . . [Appellate courts] are not in a position to second-guess the opinions of witnesses, professional or otherwise, nor the observations and conclusions of the [trial court] when they are based on reliable evidence." (Internal quotation marks omitted.) *In re Marie J.*, 219 Conn. App. 792, 820, 296 A.3d 308 (2023).

We first address the child's interpretation of the court's judgment; namely, that in determining good

consideration in accordance with the potential considerations we set forth herein.

cause, the court solely relied on the fact that placing the child outside the state would provide her with the opportunity to know her parents.[13] We disagree.

In its oral ruling, the court made findings as to the suitability of the paternal grandmother as a guardian, including her ability to provide for the child and to give her permanency; the opportunity for the child to form a bond with the paternal grandmother over virtual and in person visits; and the quality of relationships in either state when determining that the out-of-state placement would afford the child better opportunity to stay in contact with her parents and paternal family. The court also acknowledged the strength of the emotional ties between the foster parents and the child, as well as their willingness to provide permanency for the child.

---

[13] We address the child's claim that this finding by the court was speculative and clearly erroneous in part II of this opinion.

Further, to the extent that the child argues that it was improper for the court to consider whether the out-of-state placement would afford the child the opportunity to maintain a connection with her parents, we disagree. In arguing such, the child asserts that the "[t]ermination of parental rights is the complete severance by the court of the legal relationship, with all its rights and responsibilities, between the child and the child's parent[s]." Indeed, our Supreme Court has held such in the context of ascertaining the standing of a respondent parent appealing from a posttermination visitation order. See *In re Ava W.*, supra, 336 Conn. 558 (concluding that respondent mother whose parental rights had been terminated and who filed request for posttermination visitation during course of termination proceeding did have standing to challenge court's posttermination visitation order). The court's consideration of the child's opportunity to maintain a connection with her parents here, however, was "not premised on an individual's constitutional or statutory rights as a parent"; id., 565; but, rather, focused on "the child's welfare, protection, proper care and suitable support" as part of its determination of good cause. (Internal quotation marks omitted.) Id., 564. Although the petitioner sought to end the legal relationship between the child and her parents, as demonstrated by the permanency plan and the recent filing of the petition for termination of parental rights, the record indicates that both the parents and the petitioner expect supervised visitation to occur, following the child's placement with the paternal grandparents. See part II of this opinion. Thus, where the termination of parental rights has not yet occurred, or the issue of posttermination visitation has not yet been reached, we cannot conclude that the court erred in considering the opportunity for the child to maintain a connection with her parents.

Moreover, the court found that the foster parents' "loving and sustaining care . . . will help [the child] transition more easily to her paternal . . . grandparents in Florida," implicitly considering the impact the out-of-state placement would have on the child. In sum, it is evident from the court's findings that it carefully weighed the relevant characteristics of each placement option, thereby balancing the well-being of the child if placed outside the state with that of the child if she remained in Connecticut.

Having concluded that the court properly weighed relevant factors in its determination, and given our declination to set forth mandatory factors herein; see footnote 10 of this opinion; we construe the child's remaining claim as a claim that the court abused its discretion when making its good cause determination by failing to credit certain evidence over other evidence it did credit in making its good cause determination.[14] Specifically, the child claims that the trial court "*utiliz*[*ed*] *the factor of establishing and maintaining a connection with the paternal family, over and above the maternal family.*" (Emphasis added.)

"It is well established that a decision to credit certain evidence over other evidence is exclusively within the

---

[14] The child also argues that the court should have considered factors such as "the possible harm that the change in placement would cause . . . ." We have previously declined to set forth mandatory factors pursuant to a good cause determination in this context. See footnote 10 of this opinion. Further, consistent with our conclusion herein, our review of the record demonstrates that the trial court properly weighed relevant factors in its determination of good cause *based on the evidence before it*. Although evidence was presented about the child's transition to the paternal grandparents, implicating the impact the placement may have on the child, the child fails to point to any evidence in the record as to the "possible harm" arising from this out-of-state placement. In the absence of such evidence, the court would have had to resort to speculation. See *In re Selena O.*, 104 Conn. App. 635, 644–45, 934 A.2d 860 (2007) ("[i]f the court's conclusions or findings of fact rest on speculation rather than on sufficient evidence, they are clearly erroneous").

province of the trial court. . . . *Weaver* v. *Sena*, 199
Conn. App. 852, 860, 238 A.3d 103 (2020); see also *Wood-*
*bridge Crossing Condominium Assn.*, *Inc.* v. *Fergu-*
*son*, 229 Conn. App. 99, 104, 325 A.3d 1205 (2024) ([i]t
is the exclusive province of the trier of fact to weigh
the conflicting evidence, determine the credibility of
witnesses and determine whether to accept some, all
or none of a witness' testimony . . . ); *M. C.* v. *A. W.*,
226 Conn. App. 444, 466, 319 A.3d 183 (2024) (Insofar
as the defendant invites us to reconsider the evidence
that was before the court, [w]e note that it is not the
function of this court to review the evidence to deter-
mine whether a conclusion different from the one
reached could have been reached. . . . Thus, [a] mere
difference of opinion or judgment cannot justify our
intervention.). Likewise, it is not the province of this
court to reweigh the evidence before the court or to
substitute our judgment in this matter. *F. S.* v. *J. S.*,
223 Conn. App. 763, 794, 310 A.3d 961, cert. denied, 350
Conn. 903, 323 A.3d 344 (2024); see also *In re Blake P.*,
222 Conn. App. 693, 707, 306 A.3d 1130 (2023)
([a]lthough there may be evidence in the record that
would support the [plaintiff's] position, it is not the role
of [an appellate] court to examine that evidence and
substitute our judgment for that of the trial court)."
(Internal quotation marks omitted.) *Cardona v. Padilla*,
supra, 230 Conn. App. 547–48.

We, therefore, will not substitute our judgment for
that of the trial court relating to its good cause determi-
nation in this matter.

In the present case, we conclude from our review of
the record that the trial court properly weighed relevant
factors in reaching its good cause determination. We
recognize that the trial court's explanation of that find-
ing was somewhat abbreviated in comparison with its
best interest finding. When ruling on a motion for out-
of-state placement, the better practice is for the trial

court to make specific and independent findings related to best interest and good cause respectively. Here, in making its good cause finding, the court referred to findings it had made in connection with the issue of best interest, which, as we stated previously in this opinion, may involve similar subordinate findings, but are nonetheless legally distinct. We are satisfied that the findings set forth in the court's oral ruling and its articulation of that ruling not only find support in the record but adequately support a determination that there was good cause for granting the motion. See part II of this opinion. Accordingly, we cannot say that the court abused its discretion by concluding that the petitioner demonstrated good cause.

C

We next address the child's claim that the court impermissibly shifted the burden of proof on the issue of good cause from the petitioner to her. In support of this claim, the child relies on an isolated sentence in the court's oral decision: "[The child] has offered insufficient evidence for the court to conclude that the decision to place [the child] with her [paternal] grandparents in Florida is inconsistent with her best interests." The child argues that this one sentence, coupled with the court's failure to explicitly state that the burden of proof rested on the petitioner, demonstrates that the court improperly shifted the burden from the petitioner to her.[15] The petitioner counters that, "[w]hen read as

---

[15] In its analysis of this claim, the child makes several arguments concerning the evidence before the court. Specifically, the child argues that she attempted to introduce evidence establishing that there was no good cause to support the out-of-state placement of the child and attempted to elicit relevant testimony regarding, inter alia, the attachment of the child to her foster parents and the criminal charges of the father. We observe that the child does not claim that the court erred in any of its evidentiary rulings. On the contrary, in the child's reply brief, she states that she "does not appeal whether the trial court abused its discretion in denying the motion for evaluation or sustaining objections to the questions regarding attachment." Therefore, we view these arguments to pertain solely to the alleged harm that flowed from the court's alleged improper burden shifting. In light of our rejection of that claim, we need not address these arguments further.

a whole, the trial court's oral decision and articulation demonstrate that it held the [petitioner] to [her] burden." We agree with the petitioner.

We begin our analysis with the standard of review for claims that the court has misallocated the burden of proof. "The question of whether a trial court has held a party to a less exacting standard of proof than the law requires is a legal one. . . . Accordingly, our review is plenary. . . . Similarly, plenary review applies to a question of misallocation of a burden of proof. . . . Furthermore, if it is not otherwise clear from the record that an improper standard was applied, the appellant's claim will fail on the basis of inadequate support in the record." (Internal quotation marks omitted.) *In re J.R.*, 161 Conn. App. 563, 569–70, 127 A.3d 1155 (2015).

We are mindful that "an opinion must be read as a whole, without particular portions read in isolation, to discern the parameters of its holding. . . . Furthermore, [w]e read an ambiguous trial court record so as to support, rather than contradict, its judgment." (Citation omitted; internal quotation marks omitted.) *In re Jason R.*, 306 Conn. 438, 453, 51 A.3d 334 (2012).

The following details, as set forth in the court's oral decision and articulation, inform our resolution of the child's claim. At the outset of its oral decision, the court stated that "[b]efore the court is the [petitioner's] motion pursuant to § 46b-129 (j) (4) seeking an order to approve an out-of-state placement for [the child] . . . ." Similarly, at the beginning of its articulation, the court identified the motion as the petitioner's and referenced the same statute. Thus, the court correctly identified the moving party as well as the statute that applies to children committed to the care and custody of the petitioner and governs their placement by the petitioner. The plain language of the statute is explicit

in identifying which party carries the burden of proof. Section 46b-129 (j) (4) expressly states that "[*t*]*he commissioner may place* any child or youth so committed to the commissioner . . . within or without the state, *provided a child shall not be placed* outside the state except for good cause . . . ." (Emphasis added.) General Statutes (Rev. to 2023) § 46b-129 (j) (4). The court's explicit reference to the applicable statute undermines the child's argument. See *In re Denzel W.*, 225 Conn. App. 354, 376, 315 A.3d 346 (considering court's citation to controlling authority as support for conclusion that court placed burden on proper party), cert. denied, 349 Conn. 918, 317 A.3d 1 (2024). Although the court did not recite the allocation of the burden of proof in its oral decision or subsequent articulation, its citation to the statute implicitly indicated that it was aware of and applied the proper burden of proof here. See *In re M. S.*, 226 Conn. App. 857, 865, 319 A.3d 833 ("our Supreme Court has never required the talismanic recital of specific words or phrases if a review of the entire record supports the conclusion that the trial court properly applied the law" (internal quotation marks omitted)), cert. denied, 349 Conn. 920, 320 A.3d 978 (2024).

After referencing the relevant statute, the court made several findings relating to its determination of the best interest of the child. These findings primarily referred to evidence offered by the petitioner, including testimony from Mayen and the paternal grandmother; exhibit C, the unified home study prepared by the state of Florida evaluating the paternal grandparents' home; and information reflected in both exhibit A, the social study in support of the neglect petition, and exhibit B, the social study in support of the permanency plan. The court then acknowledged the appropriate standard of proof that applies to determinations of the best interest of the child and concluded that the child's out-of-state placement with the paternal grandparents was in her

best interest. In concluding such, the court considered that the out-of-state placement "will allow [the child] to maintain a connection with her paternal family while still hav[ing] the opportunity to maintain a connection with her [parents]." Here, the court referenced the petitioner's theory of good cause that it sought to establish at the hearing on the motion for out-of-state placement.[16] Thus, "[t]he court's decision . . . relate[d] the petitioner's evidence to the legal grounds that the petitioner sought to establish, implying that it was the petitioner who bore the burden of establishing those grounds." See *In re J.R.*, supra, 161 Conn. App. 570. The court then stated: *"The minor child has offered insufficient evidence for the court to conclude that the decision to place [the child] with her [paternal] grandparents in Florida is inconsistent with her best interests, nor to conclude that to do so would be detrimental to her best interest."* (Emphasis added.) In its subsequent articulation addressing whether it made a good cause finding in accordance with § 46b-129 (j) (4), the court concluded that "[t]he same facts that the court used in its finding of best interests do hereby support the finding of good cause. The court finds there is good cause for placing the child outside the state of Connecticut to be with her paternal grandparents in the state of Florida because it will allow [the child] the opportunity to maintain a connection with her [paternal] grandparents and extended paternal family."

After our careful review of the record, we are satisfied that, despite the court's isolated use of the imprecise

___

[16] During the petitioner's closing argument at the hearing, it argued before the court that "there is good cause to place the child outside the state with the paternal grandparents." Specifically, the petitioner referred to the evidence demonstrating that the paternal grandparents will allow the child to maintain a connection with her parents, such as testimony regarding the parents' agreement to the child's out-of-state placement, the intention of the paternal grandmother to allow supervised visitation between the child and the parents, and the father's consistent visitation with the child.

language that forms the basis for the child's claim, the court properly placed the burden of proof on the petitioner. The challenged language merely reflects the court's assessment of the evidence offered by the child to the court as part of its determination of whether the petitioner had met its burden with respect to good cause. See *In re Denzel W.*, supra, 225 Conn. App. 378 ("[t]he challenged language reflects the trial court's rejection of the respondent's evidence of personal rehabilitation after it had determined that the petitioner had met her burden with respect to this issue"). Moreover, this single sentence is not enough to overcome the presumption "that the trial court knows and has applied the law correctly . . . ." *Havis-Carbone* v. *Carbone*, 155 Conn. App. 848, 867, 112 A.3d 779 (2015); see also *Reinke* v. *Sing*, 186 Conn. App. 665, 700, 201 A.3d 404 (2018) ("[O]ur appellate courts do not presume error on the part of the trial court. . . . Rather, we presume that the trial court, in rendering its judgment . . . undertook the proper analysis of the law and the facts." (Internal quotation marks omitted.)). The child's claim of improper burden-shifting, therefore, fails.

## II

The child also claims that the court's determination of good cause was not supported by the evidence.[17] We disagree.

[17] In the context of arguing that the court improperly applied § 46b-129 (j) (4) in determining whether there was good cause, the child asserts an alternative argument that, to the extent that the finding of good cause is based on a best interest of the child finding, the trial court failed to analyze any of the relevant factors that are part of a best interest determination and that the best interest finding was not supported by the evidence. We view this as an argument in support of her claim that the court improperly applied § 46b-129 (j) (4) in determining whether there was good cause, as opposed to raising a new, separate claim. See *Curley* v. *Phoenix Ins. Co.*, 220 Conn. App. 732, 744, 299 A.3d 1133 ("[a] claim is an entirely new legal issue, whereas, [g]enerally speaking, an argument is a point or line of reasoning made in support of or in opposition to a particular claim" (internal quotation marks omitted)), cert. denied, 348 Conn. 914, 303 A.3d 260 (2023). Because of our conclusion herein that good cause and best interest of the child are separate inquiries, although they may share a factual basis, we

We begin by setting forth the applicable standard of review and relevant legal principles. It is well established that appellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. See *In re Davonta V.*, 285 Conn. 483, 488, 940 A.2d 733 (2008). "A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made. . . .

"On appeal, our function is to determine whether the trial court's conclusion was factually supported and legally correct. . . . In doing so, however, [g]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) Id.

We refer to the factual findings made by the trial court discussed previously in this opinion. In support of its findings, the court had before it the following testimony and documentary evidence relevant to our resolution of this appeal. At the hearing on the petitioner's motion for out-of-state placement, Mayen testified as to the child's relationship with her paternal grandparents. She testified that the paternal grandparents had been in "consistent communication" with the department, had visited the child in person three times, and had maintained weekly virtual visits. Mayen testified that, when visiting in person with the paternal grandmother, the child was "very friendly, very comfortable, [and] she would extend her arms to be carried. [The

need not reach this argument. Nonetheless, upon review of the record and relevant legal principles, we are not persuaded that the court's best interest determination was legally inadequate or unsupported by the evidence.

paternal grandmother] walked around with her, and she welcomed that . . . they embraced each other. Her children were also participating in the visit, and they were very affectionate toward [the child]. [The child] responded very well to the family." Exhibit H, a court update prepared by the department and dated April 23, 2024, provides that the child had "become familiar and now developed and maintained a relationship with" the paternal grandparents. Mayen testified that the way the child responded to her paternal grandmother formed the basis of her assessment that the child and the paternal grandmother have a relationship and a bond.

The paternal grandmother similarly testified as to the visits between her and the child, both virtually and in person in Connecticut. The paternal grandmother testified to her parenting plan for the child, childcare arrangements, and her intention regarding contact with the child's parents. The paternal grandmother stated that, if it was permitted, she would consent to the parents having supervised visits with the child. The paternal grandmother also testified that she had been in communication with the foster mother about the child and had received photos of her. The paternal grandmother indicated a willingness to continue communication with the foster parents, testifying that she would be open to staying in communication with the foster parents to learn things about the child, such as her favorite foods, that may be useful to know if the child is placed with her.

Mayen testified that the department believed that it was in the child's best interest to be placed with the paternal grandparents because they have "been nothing but forthcoming, very consistent with providing documentation, anything we need they've gone above and beyond, even to the point where if I can't give [the paternal grandmother] information, she will go out of

her way to look for that with higher ups. Also to maintain the relationship between the parents, [the paternal grandmother] would like for [the child] to get to know her biological parents, and both parents have notified the department that they are willing to move to Florida, obtain jobs, and be a part of their family, of course, while [the paternal grandmother] is always supervising their visits and interactions." Exhibit C, the unified home study prepared by the Florida Department of Children and Families, provides that the paternal grandparents "anticipate [that] [the child's] father may also move down to Florida once the baby is placed down here, giving them the support of the biological father as well." Exhibit D, the running narrative document, includes Mayen's observations during a supervised visit between the child, the father, the paternal grandmother, and her two sons. The document provides that, during the visit, the paternal grandmother inquired about a program to assist the father in securing a job, to which the father agreed and would "start making calls to see about an apprentice job that can lead to bigger and better and ultimately transfer [and/or] do that job in Florida and be closer to [the child] and his family."

The court also heard testimony regarding the current foster parents, with whom the child had been living since shortly after her birth. Mayen testified that, from her visits with the child in her current foster placement, she has assessed that there were no concerns with the placement, that the child was thriving, and that all her needs were being met. The foster mother testified to her daily routine with the child and the quality time that the child spends with the foster parents. Exhibit A, the study in support of the neglect petition prepared by the department and dated April 26, 2023, described the foster parents as "nurturing towards [the child]" and indicated that they "ensure that all of her needs are met." Similarly, exhibit B, the study in support of

the permanency plan, further provides that "[t]he foster parents love and care for [the child] deeply. [The child] always appears happy and dressed appropriately during home visits. [The] foster parents are willing to [be] a long-term resource for [the child] if reunification does not occur or in the event that placement with [the] paternal grandmother is not viable."

The foster mother testified to her history of interactions with the parents, based on her having had the child in her care since birth. She described her relationship with the father as "a little tense" and the circumstances generally as "a tense situation." The foster mother stated that there was "a lot of miscommunication back and forth" between her and the father. The foster mother testified that the father questioned her about whether she and the foster father were taking care of the child and doing the right thing for her. When asked what her plan would be regarding maintaining a relationship with the parents and extended families if she continued to be a long-term resource for the child, the foster mother testified that she thinks "we need to . . . sit down and come to an agreement. I have no problem with them. [The child] deserves to know all her family. . . . We wouldn't even mind . . . taking a trip down to Florida so that she can spend time with her [paternal] grandmother."

The foster mother further testified that she communicated with the paternal grandmother on occasion and had spoken to Mayen about "trying to build that relationship so that [the paternal grandmother] can get to know [the child]." The foster mother stated that she had previously had FaceTime calls with the paternal grandmother and would send her pictures from various events in the child's life, such as birthdays and holidays.

When asked why, if the child is stable and thriving in her current placement, the child needs to be moved,

Mayen testified that "[t]he department would like for [the child] to maintain a relationship with her biological parents, and [the paternal grandmother] wants that for [the child]. The parents want that for [the child]. And it would just be a lot easier if, when [the parents] move, that [the child] is already placed with . . . [the] paternal grandparents and be able to carry on that relationship. As of right now, [the parents] do not feel comfortable with the current foster parent, which creates a barrier between their relationships." When asked what her concerns are regarding the child remaining with the foster parents, Mayen testified that "[m]y only concern is [that] she will not be able to have the same relationship with her biological parents as she would if she was with [the paternal grandmother]."

Notwithstanding all of that evidence, the child challenges two subsidiary findings of fact made by the court as clearly erroneous and contends that these erroneous findings undermine its ultimate conclusion that there was good cause to place the child outside the state. We address each of the child's contentions in turn.

First, the child argues that the court's finding that the foster parents' "loving and sustaining care . . . will help [the child] transition more easily to her paternal . . . grandparents in Florida" is clearly erroneous as "[t]here [is] no evidence in the record, either elicited through testimony or in the exhibits entered at trial, that because of the care [the child] had received, it would be an easy transition to the paternal grandparents." We disagree with the child's interpretation of the court's finding. The court did not find that the transition would be easy but rather it would be *made easier* by the foster parents' loving and sustaining care. Indeed, the court had ample testimony before it to support this finding. The paternal grandmother and the foster mother both testified to the ongoing communication between the two of them to build the relationship

between the paternal grandmother and the child. The paternal grandmother testified that, should the child be placed in Florida, she would be open to the foster parents visiting and staying in contact with the child. She also testified that she would be open to staying in communication with the foster parents to learn things about the child, such as her favorite foods, that may be useful to know if the child is placed with her. This evidence supports the reasonable inference that the foster parents' love and care will facilitate the child's transition to living with the paternal grandparents. See *Camozzi* v. *Pierce*, 230 Conn. App. 616, 625, 331 A.3d 159 ("[u]nder the clearly erroneous standard of review, a finding of fact must stand if, on the basis of the evidence before the court and the reasonable inferences to be drawn from that evidence, a trier of fact reasonably could have found as it did" (internal quotation marks omitted)), cert. denied, 351 Conn. 921, 333 A.3d 103 (2025). Consequently, we do not conclude that the court's finding is clearly erroneous.

Second, the child argues that the court's finding "that the parents would actually move to Florida and/or would maintain a relationship with [the child]" is clearly erroneous as it was not based on any evidence in the record but rather was "pure speculation." We again disagree with the child's interpretation of the court's finding. Specifically, the court found that the parents "indicated that they eventually intended to relocate to Florida to be closer to [the child] and the paternal family." The court's finding was confined to the parents' *intentions* to move to Florida. There was ample evidence in the record supporting this finding. At trial, Mayen testified that "both parents have notified the department that they are willing to move to Florida, obtain jobs, and be a part of their family, of course, while [the paternal grandmother] is always supervising their visits and interactions." Similarly, when asked

whether her son would move to Florida with the intention of being closer to the child, the paternal grandmother testified, "[p]ossibly. Yes." Much of the documentary evidence before the court reflects that same intention. Exhibit B, the study in support of the permanency plan, and similar language in exhibit D, the running narrative document, provides that the parents "are both in agreement with [the child] being placed in Florida with her paternal grandparents." Exhibit B further states that the parents "continue to state [that] they will eventually relocate to Florida and would like to be closer to [the child] and [the paternal] family." Exhibit C, the unified home study prepared by the Florida Department of Children and Families, similarly states that "[the] father has stated [that] he will move down to Florida once the child is placed with his parents, in order to get his life together" and that the paternal grandparents "anticipate [the child's] father may also move down to Florida once the baby is placed down there, giving them the support of the biological father as well." Without engaging in speculation, the court was free to draw reasonable and logical inferences from the evidence and facts proven. In light of the ample evidence supporting the court's finding that the parents have "indicated that they eventually intended" to move to Florida, we cannot conclude that the court's finding is clearly erroneous.

In sum, we conclude that the specific factual findings challenged by the child are not clearly erroneous. Further, as discussed previously, there was ample evidence in the record, unchallenged by the child, supporting the trial court's ultimate conclusion that there was good cause to place the child outside the state.[18]

---

[18] We reiterate that our review here is governed by the clearly erroneous standard and, as such, we "do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached." (Internal quotation marks omitted.) *In re Davonta V.*, supra, 285 Conn. 488. Notwithstanding our conclusion herein, we echo the acknowledgement by the trial court in its oral decision of the admirable efforts by the foster parents in caring for the child.

Although, as we have stated previously in this opinion, the child also challenges the court's good cause finding because it was made in the absence of expert testimony, we are not persuaded that expert testimony was necessary. See footnote 9 of this opinion. The trial court would have been free to accept, reject, or partially rely on any relevant expert testimony had it been offered and admitted; see *In re Niya B.*, 223 Conn. App. 471, 497, 308 A.3d 604, cert. denied, 348 Conn. 958, 310 A.3d 960 (2024); however, such expert testimony is not a precondition to the court's own evaluation of the factual record before it. Section 46b-129 (j) (4) does not impose any such requirement nor does the child cite to any binding authority supporting her proposition that, as a matter of law, expert testimony was needed to support the court's judgment in granting the motion for out-of-state placement. The appellate courts of this state have repeatedly held that, in the context of termination of parental rights cases and in considering custodial placements, expert testimony is not required to support a trial court's determination as to the child's best interest. See *In re Jeisean M.*, 270 Conn. 382, 400, 852 A.2d 643 (2004); *In re Santiago G.*, 154 Conn. App. 835, 857 n.19, 108 A.3d 1184, cert. denied, 315 Conn. 927, 109 A.3d 922, aff'd, 318 Conn. 449, 121 A.3d 708 (2015). Like a best interest finding, a good cause finding is a highly fact specific inquiry, and we reject the notion that our trial court judges lack the ability to weigh the evidence and make correct determinations in this regard. "Expert testimony is necessary when the subject in question is beyond the field of ordinary knowledge and experience for a judge." *In re Alexander T.*, 81 Conn. App. 668, 676, 841 A.2d 274, cert. denied, 268 Conn. 924, 848 A.2d 472 (2004). Our review of the court's findings supports our conclusion that they were all within the province of the fact finder. Although the child raises several arguments as to the court's findings

regarding the child's transition,[19] the record in this case was sufficient to support the court's findings without testimony from an expert. Accordingly, we conclude that the court did not err when it found that the petitioner demonstrated good cause.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[19] We note that the child briefly mentions in her appellate brief that "[w]hether [the child] should continue to have a relationship with her parents is also clearly within the province of an expert." The child provides no analysis beyond this conclusory assertion, nor does she cite any relevant authority to support this claim. Accordingly, the child's claim is inadequately briefed. "Claims are inadequately briefed when they are merely mentioned and not briefed beyond a bare assertion. . . . Claims are also inadequately briefed when they . . . consist of conclusory assertions . . . with no mention of relevant authority and minimal or no citations from the record . . . . " (Internal quotation marks omitted.) *Estate of Rock* v. *University of Connecticut*, 323 Conn. 26, 33, 144 A.3d 420 (2016).